**Ernest L. SIGNORELLI,**
**Plaintiff-Appellant,**

v.

**Herbert B. EVANS, as Chief Administrative Judge of the Courts of the State of New York, et al., Defendants-Appellees.**

**No. 1513, Docket 80–7511.**

United States Court of Appeals,
Second Circuit.

Argued July 21, 1980.

Decided Dec. 23, 1980.

---

Joel M. Markowitz, Stony Brook, N. Y., for plaintiff-appellant.

Raymond S. Hack, New York City (Gerald Stern, Seth Halpern and Alan Friedberg, New York City, on brief), for defendant-appellee State Commission on Judicial Conduct.

Stephen G. Crane, Michael Colodner, and Cynthia Hutchinson, New York City, submitted a brief for defendants-appellees Herbert B. Evans, as Chief Administrative Judge of the Courts of the State of New York, and the Court of Appeals of the State of New York.

Robert Abrams, Atty. Gen., George D. Zukerman, Asst. Sol. Gen., Paul M. Glickman, Stephen M. Jacoby, Asst. Attys. Gen. and Frederic L. Lieberman, Legal Asst., New York City, submitted a brief for defendants-appellees Hugh L. Carey, as Governor of the State of New York and Robert Abrams, Atty. Gen., of the State of New York.

Before VAN GRAAFEILAND and NEWMAN, Circuit Judges, and NEAHER, District Judge.*

NEWMAN, Circuit Judge:

The Constitution of the United States specifies that no person may be a member of the House of Representatives unless that person is at least 25 years old, has been a United States citizen for at least seven years, and, at the time of election, is an inhabitant of the State from which the person was chosen. U.S.Const., Art. I, § 2, cl. 2. The State of New York has adopted restrictions on the political activity of state judges that have the effect of requiring a state judge to resign from his judicial office before campaigning for political office, including the office of United States Representative. Ernest L. Signorelli, Surrogate of Suffolk County, New York, intending to run for Congress in the fall of 1980, brought this action to challenge New York's regulatory provisions on the ground that they violate the Qualifications Clause of the Constitution by imposing an additional qualification for Congressional office—that the person not be a state judge. The District Court for the Eastern District of New York (Jacob Mishler, Judge) upheld the constitutionality of the challenged provisions. Upon Signorelli's appeal, we recognized his need for an immediate ruling in order to meet candidacy filing deadlines if his challenge to the state law provisions were upheld. We ruled on his appeal at the conclusion of the oral argument on July 21, affirming the decision of the District Court. This opinion details the reasons for that decision.

Appellant has been a New York state judge for twenty-one years. He was elected to his current position as Surrogate in 1975 for a term expiring on December 31, 1985. Having been encouraged by members of his community to seek nomination as the Republican candidate for Congress in his district, appellant was confronted by three provisions of New York law that required his resignation from judicial office before taking even the most preliminary steps toward obtaining his party's nomination.

* Hon. Edward R. Neaher of the United States District Court for the Eastern District of New York, sitting by designation.

The New York State Constitution, Art. VI, § 20(b) ("the State Constitutional Provision"), requires a judge to resign from his position upon nomination for any public office other than his judgeship or automatically forfeit his judicial post in ten days. The State Constitution further provides that state judges are subject to such rules of conduct as may be issued by the Chief Administrative Judge with the approval of the New York Court of Appeals. N.Y. Const., Art. VI, §§ 20(b) & 28. Section 33.7 of the Rules Governing Judicial Conduct ("the Rule"), promulgated pursuant to the State Constitution, prohibits a state judge from participating in any political campaign, except a campaign for reelection to his judicial office. The State Commission on Judicial Conduct, subject to review by the Court of Appeals, may sanction a judge who violates the Rules of Conduct by admonishment, censure, or removal. N.Y. Const., Art. VI, § 22; N.Y. Judiciary Law §§ 40–48 (McKinney Supp.1978); 22 N.Y.C. R.R. §§ 700.1–704.12. Completing New York's regulatory framework for state judges in their pursuit of political office is the Code of Judicial Conduct, adopted by the New York State Bar Association and recognized by the state courts as establishing standards that may result in discipline if violated. See *People v. La Carruba*, 46 N.Y.2d 658, 416 N.Y.S.2d 203, 389 N.E.2d 799 (1979); *Bartlett v. Flynn*, 50 A.D.2d 401, 378 N.Y.S.2d 145 (4th Dept.), *appeal dismissed*, 39 N.Y.2d 942, 386 N.Y.S.2d 1029 (1976). As adopted in New York, Canon 7 A(3) of the Code ("the Canon") requires a judge to resign from his position upon becoming a candidate for non-judicial office in a party primary or in a general election.

Appellant wished to retain his judicial post while campaigning so that he could complete his term as surrogate in the event that he was unsuccessful in his pursuit of Congressional office. He therefore sought to enjoin enforcement of the three New York provisions inhibiting his candidacy and to obtain a declaration of their unconstitu-

tionality as applied to candidates for federal office. Appellant contended, among other grounds,[1] that the requirement that a state judge resign his judgeship upon seeking political office imposed a qualification for election to Congress in addition to those enumerated in the Qualifications Clause and was unconstitutional because of the exclusivity of that Clause. As appellant had not yet commenced any political activity, the District Court first analyzed the justiciability of the claims. Judge Mishler ruled that the challenges to the Rule and the Canon, but not to the State Constitutional Provision, were ripe for adjudication. The Court then held that those two provisions did not impose a qualification on the federal office, but rather, regulated the qualifications for state judicial office.

## I. Justiciability

As appellant has not yet engaged in any political activity to trigger enforcement of New York's provisions, his appeal raises the preliminary jurisdictional issue of justiciability. The District Court held that even though appellant had not yet begun to campaign, his avowed intention to engage in political activity that would violate the Rule and the Canon created a controversy ripe for adjudication with respect to those two provisions. The Court declined to consider the objection to the State Constitutional Provision because that provision would come into operation only at a later stage in a political campaign if Signorelli obtained his party's nomination; the Court considered the challenge to that provision to be premature. We conclude that appellant's challenges to all three provisions are justiciable.

In *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), the Supreme Court held that review of the Hatch Act, which prohibits federal employees from engaging in certain political activities, was nonjusticiable with respect to those plaintiff-employees who had not yet

---

**1.** Surrogate Signorelli had also contended that the provisions violated the First and Fourteenth Amendments, but he does not challenge on appeal the District Court's rejection of these two contentions.

engaged in any of the prohibited activity. Subsequently, however, the Court relaxed *Mitchell's* strict approach to justiciability. If the injury is clearly impending, the Court has held that the plaintiffs need not await consummation of the injury to bring their suit. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974); *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974); *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923).

Rule 33.7 will be violated by appellant immediately upon his taking any steps towards his candidacy, and Canon 7 will be violated either then, or, with virtual certainty shortly thereafter, for he will formally qualify as a candidate in the primary election upon obtaining signatures from only 1,250 of the 103,000 Republican voters in his district. If appellant acts in violation of the Rule or the Canon, he faces certain sanction of admonishment, censure, or removal by the State Commission on Judicial Conduct. While these sanctions are civil and not penal in nature, the reputational taint incurred by admonishment or censure, and the direct loss of livelihood from removal, clearly pose the threat of serious injury to appellant. As this Court has held in the context of considering the justiciability of a professional disciplinary rule, the threat and injury of civil sanctions may be as severe as that of the imposition of penal sanctions. *Person v. Association of the Bar of the City of New York*, 554 F.2d 534, 536–37 (2d Cir.), *cert. denied*, 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282 (1977) (disciplinary proceedings and disbarment comparable to criminal prosecution). Appellant's challenges to the constitutionality of the Rule and the Canon are clearly justiciable under the Supreme Court's current standard.

Moreover, the plaintiffs in *Mitchell* had stated their proposed course of conduct in only a very general manner. The Supreme Court consequently found that it could only speculate concerning both what the plaintiffs would do and how serious the subsequent threat of enforcement would be. 330 U.S. at 89–90, 67 S.Ct. at 564–565. Appellant, however, has indicated his proposed course of activity with specificity in his complaint, leaving no room for judicial speculation concerning the intended private action and the likely official response.

Operation of § 20(b) of Article VI of the New York Constitution is more remote and uncertain than that of the Rule and the Canon since appellant may be unsuccessful in his political activity and not win his party's nomination, the sole event that activates the Constitution's mandatory forfeiture of office. The District Court found that this contingency, which would not be resolved for several months, precluded adjudication of the challenge to the State Constitutional Provision.

In the *Regional Rail Reorganization Act Cases, supra*, the Supreme Court held justiciable a challenge to that Act although there would be an extended time delay before the challenged provision became effective. The Court emphasized three factors: the parties had to make decisions in the immediate future that would be affected by the outcome of the lawsuit; the factual record would not be more fully developed at the later point; and the careful statutory scheme afforded no better time to determine the provision's constitutionality and minimize irreparable injury. 419 U.S. at 144–45, 95 S.Ct. at 359. Moreover, as the Court noted in *Babbitt v. United Farm Workers National Union, supra*, in challenges involving election procedures, justiciability depends more on the prospect of injury in an impending or future election than on the existence of past injury. 442 U.S. at 300 n.12, 99 S.Ct. at 2309 n.12. The considerations identified in *Regional Rail* and *Farm Workers* persuade us that appellant's challenge to the State Constitutional Provision is justiciable. Appellant's decision about his candidacy, which must be made now because of filing deadlines, will be affected by our decision; no substantial improvement in the factual record will re-

sult from the outcome of the primary; under the statutory system, injury will be minimized by determining the constitutionality of the provision now, before the mandatory forfeiture occurs; and, as in *Farm Workers*, there is a need to focus on prospective rather than past injury. The only factor weighing against justiciability is that the forfeiture of office will not occur if appellant does not win the nomination. But under the circumstances of this case he is entitled to know whether forfeiture may validly occur before he embarks on a substantial undertaking to secure the nomination.

## II. The Merits

■ Appellant's constitutional challenge to New York's provisions is based upon the Qualifications Clause, which provides: "No person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen." U.S.Const., Art. I, § 2, cl. 2. In *Powell v. McCormack*, 395 U.S. 486, 532, 89 S.Ct. 1944, 1969, 23 L.Ed.2d 491 (1969), the Supreme Court held that the qualifications enumerated in the Clause are exclusive. The principle that a branch of Congress cannot add to, subtract from, or modify those qualifications, *ibid.*, applies with equal force to the states, and numerous state laws have been invalidated for imposing additional qualifications for nomination or election to Congress in violation of the Clause. See, *e. g., Dillon v. Fiorina*, 340 F.Supp. 729 (D.N.M.1972) (filing fee and one-year party affiliation to run in primary); *Stack v. Adams*, 315 F.Supp. 1295 (N.D.Fla.1970) (exclusion of state officeholders); *Stockton v. McFarland*, 56 Ariz. 138, 106 P.2d 328 (1940) (exclusion of judges during term of office); *Buckingham v. State*, 42 Del. 405, 35 A.2d 903 (1944) (exclusion of judges during term of office and six months thereafter); *Lowe v. Fowler*, 240 Ga. 213, 240 S.E.2d 70 (1977) (exclusion of state officeholders); *Hellmann v. Collier*, 217 Md. 93, 141 A.2d 908 (1958) (district residency requirement); *Danielson v. Fitzsimmons*, 232 Minn. 149, 44 N.W.2d

484 (1950) (exclusion of convicted felons); *Riley v. Cordell,* 200 Okl. 390, 194 P.2d 857 (1948) (exclusion of judges during term of office); *Ekwall v. Stadelman*, 146 Or. 439, 30 P.2d 1037 (1934) (same); *State ex rel. Chandler v. Howell*, 104 Wash. 99, 175 P. 569 (1918) (same).

New York's regulatory scheme imposes a lesser restriction than state laws that prohibit judges from running for Congressional or other office during the judicial term for which they were elected. The invalidation of such statutes, see *Stockton v. McFarland, supra; Riley v. Cordell, supra; Ekwall v. Stadelman, supra*, vindicated a "fundamental principle of our representative democracy" that " 'the people should choose whom they please to govern them.' " *Powell v. McCormack, supra*, 395 U.S. at 547, 89 S.Ct. at 1977 (quoting Alexander Hamilton, 2 *Elliot's Debates on the Federal Constitution* 257 (1836)). Obviously, a prohibition of Congressional candidacy during the term of a person's judicial or other office limits directly and, for a period of time, absolutely the choice of the electorate. New York's scheme, however, confronts the prospective candidate with a choice: he may run for Congress if he is willing to resign his judgeship. This indirect form of regulation is slightly different from those statutes that enforce the choice by denying the prospective candidate access to the ballot until he has resigned his judgeship. See *Stack v. Adams, supra; Ekwall v. Stadelman, supra*. New York places no obstacle between Signorelli and the ballot or his nomination or his election. He is free to run and the people are free to choose him.

Nevertheless, it must be acknowledged that New York's regulatory scheme, though focusing on the judicial office, rather than on the ballot, imposes, albeit indirectly, a qualification upon Signorelli's freedom to run for Congress. In addition to being over 25, a citizen for seven years, and an inhabitant of New York, he must not be a state judge. The fact that Signorelli has it within his power, by his own choosing, to satisfy this fourth requirement does not answer his objection that the requirement is an addi-

tional qualification beyond the exclusive trio specified by the Constitution. State laws that require a Congressional candidate to live within the Congressional district he seeks to represent have uniformly been invalidated as imposing an additional qualification, notwithstanding the candidate's freedom to move into the district. *Exon v. Tiemann*, 279 F.Supp. 609 (D.Neb.1968); *Hellman v. Collier, supra; State ex rel. Chavez v. Evans*, 79 N.M. 578, 446 P.2d 445 (1968).

The district residency cases illuminate the issue in this case because they exemplify a state regulation aimed solely at eligibility for Congressional office and justifiable, if at all, only on a state's power to set qualifications for such office, since states have no general authority to tell people where to live, see *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Edwards v. California*, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed.2d 119 (1941). By contrast, New York's regulatory scheme is aimed at the judicial office, a local government subject on which New York's regulatory authority is plenary. See *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). This distinction suggests that a state regulation, though it functions indirectly as a requirement for Congressional candidacy, may not necessarily be an unconstitutional additional qualification if it is designed to deal with a subject within traditional state authority. A somewhat analogous situation arises when states impose occupational restrictions upon convicted felons. Such restrictions indirectly have the effect of adding an additional penalty for the offense, but they are sustained nonetheless, over objections based on the Ex Post Facto Clause, U.S.Const., Art. I, § 10, cl. 1, because they are enacted not as penalties but as regulations of particular occupations. See *De Veau v. Braisted*, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (union office); *Hawker v. New York*, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (medical practice). As to such statutes, the legislative purpose controls. Similarly, here, it can be argued that New York's purpose is to regulate the judicial

office that Signorelli holds, not the Congressional office he seeks. There is a distinct risk, however, that this line of argument proves too much, that it would permit the states, exercising their acknowledged authority to regulate occupations, to require lawyers to resign from the bar or business executives to resign corporate offices prior to seeking public office. But such a sweeping elimination of broad categories of people from those eligible for election would conflict with the expressed intent of the Framers to maintain broad public choice of elected representatives. See, *e. g.*, 2 M. Farrand, *The Records of the Federal Convention of 1787*, at 121 (1937) (Gouverneur Morris' preference for qualifications in electors, not the elected); 2 *Elliot's Debates on the Federal Constitution* 257 (1836) (Alexander Hamilton's view that people should be as unrestricted as possible in their choice of representative).

The risk of using regulatory authority in an unconstitutional manner does not mean that its use in this case offends the Constitution. We believe there is a distinction to be drawn between restrictions upon a broad range of occupations, which, if attempted, would indirectly impose added requirements for Congressional office upon large categories of people, and restrictions upon specified state offices peculiarly within the essential regulatory authority of the states. The Constitution itself points the way toward that distinction by including the Incompatibility Clause, which regulates federal offices even though it indirectly imposes an additional requirement upon holding Congressional office.

The Incompatibility Clause, U.S.Const., Art. I, § 6, cl. 2, provides: "[N]o Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." The Clause originated in Edmund Randolph's Resolutions, known as the Virginia Plan, presented to the Constitutional Convention at the start of its deliberations: "Resolved that the members of the first branch of the National Legislature [the House of Representatives] ought to be ... ineligible to any office established by a particular State, or

under the authority of the United States ... during the term of service, and for the space of ____ after its expiration." 1 M. Farrand, *supra*, at 20.[2] When this proposal was considered by the Convention, two conflicting concerns were expressed. Some delegates feared subversion of the Congress if the President could reward Members with official posts.[3] Other delegates feared that excessive restrictions on officeholding would deter the most talented men from running for Congress.[4] Throughout the debate on the scope of Members' ineligibility for appointive office, it was clear that all sides accepted the principle of incompatibility: no one should be allowed to hold Congressional and other federal office at the same time.[5]

2. A similar resolution was proposed for the members of the Senate. 1 M. Farrand, *The Records of the Federal Convention of 1787*, 21 (1937). Randolph's resolution was an extension of Article V of the Articles of Confederation, which stated that no person, being a delegate to Congress, was capable of holding any office under the United States for which he received compensation. *See* C. Warren, *The Making of the Constitution* 613 (1937).

  Randolph included the ineligibility provision in a resolution detailing the mode of election, term of office, compensation, and qualifications for the members of the legislative branch. After the resolution was first presented, the clauses concerning qualifications and ineligibility for office were separately considered and never rejoined. The Incompatibility Clause has thus generally been disregarded when the qualifications for Members of Congress are discussed. *Cf. Powell v. McCormack*, 395 U.S. 486, 520 n.41, 89 S.Ct. 1944, 1963 n.41, 23 L.Ed.2d 491 (1969) (declining to decide whether Incompatibility Clause was qualification within the meaning of the Qualifications Clause, although holding that the latter clause was exclusive); *but see* The Federalist No. 52 (Madison) (in discussing the constitutional qualifications for membership in the House, Incompatibility Clause was included with the requirements of the Qualifications Clause).

  The language of the Incompatibility Clause was developed during the early discussions of the proposed Ineligibility Clause and was foreshadowed by the Report of the Committee of Detail to the Convention, 2 M. Farrand, *supra*, at 180 (members of both houses are "ineligible to, and incapable of holding any office under the authority of the United States during the time for which they shall respectively be elected"). The Convention inverted the formulation so that the ban on simultaneous holding of positions was expressed from the perspective of officeholders rather than congressmen, and the provision in the Constitution was unchanged by the Committee of Style.

3. *See, e. g.,* 1 M. Farrand, *supra*, at 393 (Gerry: "It appears to me, that we have constantly endeavored to keep distinct the three great branches of government; but if we agree to this motion [striking the Ineligibility Clause], it must be destroyed by admitting the legislators to share in the executive, or to be too much influenced by the executive, in looking up to him for offices"); *id.* at 380–81 (Mason: "I admire many parts of the British constitution and government, but I detest their corruption.... [B]y the sole power of appointing the increased officers of government, corruption pervades every town and village in the kingdom.... I consider this clause as the cornerstone on which our liberties depend—and if we strike it out we are erecting a fabric for our destruction").

4. *See, e. g., id.* at 381–82 (Hamilton: "Our prevailing passions are ambition and interest; and it will ever be the duty of a wise government to avail itself of those passions, in order to make them subservient to the public good—for these ever induce us to action. Perhaps a few men in a state, may, from patriotic motives, or to display their talents, or to reap the advantage of public applause, step forward; but if we adopt the clause [Ineligibility], we destroy the motive"); *id.* at 388–89 (Madison: "The objects to be aimed at were to fill all offices with the fittest—characters, & to draw the wisest & most worthy citizens into the Legislative service.... [T]he impulse to the Legislative service, was evinced by experience to be in general too feeble with those best qualified for it. This inconveniency wd. also be more felt in the Natl. Govt. than in the State Govts. as the sacrifice reqd. from the distant members wd. be much greater, and the pecuniary provisions, probably, more disproportionate. It wd. therefore be impolitic to add fresh objections to the [Legislative] service by an absolute disqualification of its members").

5. *See, e. g.,* 1 M. Farrand, *supra*, at 382 (Hamilton opposes all exclusions and refinements except for incompatibility); 2 *id.* at 284, 489–90 (Pinckney moves to reduce extended ineligibility to incompatibility). Proposals incorporating incompatibility language were adopted unanimously, *see, e. g.,* 1 *id.* at 390 (motion to insert "and incapable of holding" after words "eligible to offices" agreed to nem con.); 2 *id.* at 492 (Incompatibility Clause adopted nem con.), whereas the language of an ineligibility provision was extensively debated, *e. g.,* 1 *id.* at 215–19, 375–77, 386–90, 428–29; 2 *id.* at 283–89, 489–92. *See Reservists Comm. to Stop the*

Ultimately a compromise was struck. Randolph's proposal that Members of Congress should be ineligible, during their elected terms plus some additional time period, for any federal office was modified in two ways. First, the period of ineligibility became only the term of the elected office. More significantly, the scope of ineligibility was cut back from any federal office to only those created or whose salaries were increased during the elected term.[6] This change permitted Members of Congress (after the 1st Congress) to be appointed, during their elected terms, to most existing federal offices, and that prospect required the Framers to spell out in the Incompatibility Clause and an Incompatibility Clause. taneous holding of elective and other offices. Thus, to secure the principle of separation of powers and reduce an opportunity for undue influence by the Executive Branch upon the Congress,[7] the final version of § 6, cl. 2, contained both an Ineligibility Clause and Incompatibility Clause. Though the latter indirectly functions to add a qualification for Congressional office, i. e., not holding other federal office, there is no indication that the Framers thought they were thereby impairing the broad choice of the electorate protected by the Qualifications Clause.

The existence of the Incompatibility Clause has significance for evaluating New York's restrictions on state judges. By requiring state judges to resign from their positions if they seek election to Congress, New York adopts its own incompatibility principle, protecting the integrity and independence of the judicial branch from the conflicting activities of seeking and holding Congressional office. New York's concern for the independence of its judiciary serves interests as fundamental to a constitutional democracy as those served by the Framers' concern for the independence of Congress. These fundamental interests in the structure of government far transcend the interests involved when a state exercises general regulatory authority over non-governmental occupations. Unless the Incompatibility Clause represents the exclusive limit on simultaneous officeholding, the Clause stands as analogous authority for New York to regulate its judiciary by obliging its judges seeking Congressional office to resign their judgeships, just as the Incompatibility Clause requires similar resignation by federal officeholders before holding Congressional office.

There is no reason to believe that the Framers intended the Incompatibility Clause to be exclusive of additional state provisions. Randolph's initial proposal for an Ineligibility Clause had barred Members of Congress from holding state offices. This provision was summarily rejected by the Convention with little discussion.[8] In moving to strike the provision as applied to Members of the House of Representatives, Charles Pinckney stressed the inconvenience of such a restriction upon both members of the national legislature and the

*War v. Laird,* 323 F.Supp. 833, 835 (D.D.C. 1971), *rev'd on other grounds sub nom. Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); 2 J. Story, *Commentaries on the Constitution of the United States* §§ 864 & 866 (1833).

6. *Cf. id.* at 386 (Madison: unnecessary creation of offices and increases of salaries were evils most experienced and if that door were shut, the door could properly be left open for appointment of members to other offices as encouragement to legislative service).

7. *See* The Federalist No. 76 (Hamilton) ("The Constitution has provided some important guards against the danger of executive influence upon the legislative body" through the Incompatibility Clause); C. Warren, *supra,* at 618. The same conclusion concerning the in-

tent of the Framers was reached in *Reservists Comm. to Stop the War v. Laird, supra* at 835 (Gesell, J.). In reversing the trial court, the Supreme Court did not reach the merits of the case.. 418 U.S. at 215 n.4, 94 S.Ct. at 2929 n.4.

8. The first motion to strike ineligibility for state offices for members of the House was defeated by a vote of 5 to 4 (2 states were divided), 1 M. Farrand, *supra,* at 217, but when the same proposal was raised eleven days later, it passed by a vote òf 8 to 3, *id.* at 386. A motion to consider the question whether members of the Senate should be ineligible and incapable of holding state office was rejected by the same division of votes, 8 to 3, *id.* at 429. The records of the discussion on all three occasions are extremely sparse.

states that desired their services 1 M. Farrand, *supra*, at 386. In seconding the motion, Roger Sherman suggested that adopting a state ineligibility requirement would be equivalent to erecting a "Kingdom at war with itself." *Id.* In discussing eligibility for state office by members of the Senate, James Wilson objected that elimination of ineligibility would create an additional dependence in senators upon the states. *Id.* at 428–29. Pinckney, in defense, argued that the states should be made as much a part of the national government as possible, and that such a bar would both discourage the ablest men from going into the Senate and deprive the states of the opportunity to call members back home into state offices. *Id.* at 429.

■ In view of this record, the Convention's deletion of a bar against simultaneous holding of Congressional and *state* office does not imply that the remaining bar against simultaneous holding of Congressional and *federal* office was intended to preempt state regulation. The debates imply that the primary concern of those seeking to eliminate the state office restriction was to give the states the widest latitude in *permitting* dual officeholding, and not to restrict state options. The Framers perceived their proper role as limiting the extent of overlap and the possibilities of corruption within the sphere of federal offices, but by doing so, they expressed no intention to intrude upon state regulatory efforts in this same area.[9] New York can properly disqualify its judges from holding other offices, paralleling the federal structure, and not offend the Qualifications Clause because the analogous constitutional provision, the Incompatibility Clause was not intended to preempt similar state regulation.

■ The sole difference between the Constitution's restrictions on federal officeholders and New York's limitations on state judges is a question of timing. While the federal Incompatibility Clause takes hold upon assumption of a seat in Congress, New York's regulations go into effect at the campaign stage. Thus in New York's scheme, the state judge must give up his office to seek election, while under the Incompatibility Clause, the federal officeholder need not resign until he knows whether he has been elected. This distinction, however, does not create a constitutional objection in light of the purpose underlying the

---

**9.** As Mr. Justice Story stated, "[The Incompatibility Clause was] doubtless founded in a deference to state jealousy, and a sincere desire to obviate the fears, real or imaginary, that the general government would obtain an undue preference over the state governments." 2 J. Story, *supra*, at § 866. From this standpoint, the purposes of the Clause would not be frustrated by a state's regulation of state officeholding because the Framers meant only to give the states the opportunity to have dual officers.

The Framers were aware of the diversity of practices among the states concerning eligibility for dual office, and referred to them for support during the debate on the scope of federal officeholding. *See, e. g.*, 1 M. Farrand, *supra*, at 389–90 (Jenifer: in Maryland, senator could hold no other office and this gained confidence of the people); 2 *id.* at 491 (Gorham: experience of state governments with no ineligibility provision proved it was unnecessary and that eligibility was inducement for fit men to enter legislative service); *id.* (Baldwin: examples of state legislatures inapposite because they were so numerous that excluding members would not leave enough proper men for offices). Although they may have assumed members of Congress would simultaneously hold state offices, *see, e. g.*, The Federalist No. 56 (Madison) (in defending challenges to smallness of the size of the House with respect to the members' possessing adequate knowledge of local interests, Madison notes that Representatives may have been or may even simultaneously be members of state legislatures), this does not presuppose any intention to deny that states could alter such arrangements if they deemed it necessary. The Framers did not seem fearful of state influence on the national legislature, *see, e. g.*, 1 M. Farrand, *supra*, at 386 (Pinckney: minimizing possible effect of state officeholding on independence of national legislature); *id.* at 393 (Wilson: by its vote, Convention appears not to fear danger of state appointments), but were more concerned about the availability of persons for office when the states desired the overlap, *see, e. g., id.* at 389 (Madison: "The Legislature of Virg[ini]a would probably have been without many of its best members, if in that situation, they had been ineligible to Congs. to the Govt. & other honorable offices of the State"). *Cf.* 2 J. Story, *supra*, at § 866 (Incompatibility Clause response to concerns that general government would out-recruit state governments).

Incompatibility Clause. The Clause was not intended to protect officeholders from the risks of the electoral process, but rather to protect the integrity of the structural form of our government. The effect of the compromise embodied in the Incompatibility Clause would be unaltered if the federal officeholder were obliged to give up his office when seeking a Congressional seat instead of upon his election. New York's provisions achieve the essential purpose of the Incompatibility Clause by adopting at the state level one of the Constitution's devices for protecting the separation of federal powers. Though New York has, in a sense, indirectly added a qualification for Congressional office, it has not violated the Constitution because the purpose of the challenged provisions is to protect the integrity of a branch of state government by the same principle of incompatibility that the Constitution itself has endorsed for the national government.

Affirmed.