542 S.E.2d 405

STATE of West Virginia ex rel. George E. CARENBAUER, Petitioner,

v.

Honorable Ken HECHLER, Secretary of State of West Virginia, and the Honorable Warren R. McGraw, Justice of the Supreme Court of Appeals of West Virginia, Respondents.

No. 27458.

Supreme Court of Appeals of West Virginia.

Submitted March 17, 2000.

Decided March 31, 2000.

Dissenting Opinion of Justice Starcher Dec. 14, 2000.

George E. Carenbauer, Charleston, for Petitioner, Pro Se.

James M. Sprouse, Union, Rebecca A. Baitty, Sarasota, FL, for Respondent McGraw.

Darrell V. McGraw, Jr., Attorney General, Robert D. Williams, Assistant Attorney General, Charleston, for Respondent Hechler, Secretary of State of West Virginia.

Rudolph L. diTrapano, Charleston, Amicus Curiae.

SCOTT, Justice.

Relator George E. Carenbauer[1] seeks a writ of mandamus to have Respondent, the Honorable Warren R. McGraw, declared ineligible as a candidate for election to a separate twelve-year term on this Court.[2] As grounds for the extraordinary relief sought, Relator asserts that Justice McGraw fails to qualify as an eligible candidate for office due to his status as an incumbent currently fulfilling an unexpired term to which he was elected. Additionally, Relator contends that Justice McGraw's actions first, as the author of a recent opinion[3] declaring Speaker of the House of Delegates Robert S. Kiss ineligible for appointment to this Court under the emoluments clause of this state's constitution, and now, in seeking the position which Speaker Kiss was denied,[4] have both undermined the integrity of this judicial institution and cast upon it a pernicious cloak of aspersion. Following an exhaustive examination of constitutional principles combined with an equally thorough review of judicial decisions concerning the penumbral issues presented by the petition, we conclude that while the constitution does not expressly proscribe an incumbent justice whose term has yet to be fulfilled from seeking election to a separate seat on this Court, the intent underlying the enactment of article VIII of our state constitution, which sets forth the requirements for selection to this Court, as well as the entire structure of the judicial branch of government; the social compact of this state's citizenry as expressed through the adoption of both the Constitution and the Judicial Reorganization Act of 1974; and the state's compelling interest in maintaining the integrity

1. Relator maintains that he has filed this action "entirely on his own behalf as a citizen, taxpayer and Democrat, independent of any other personal, commercial, or professional associations he may have." Relator cites his party status as a basis for seeking relief herein, given the possibility that Governor Cecil H. Underwood, a Republican, would have the task of appointing a justice to fill the remainder of the unexpired term which Justice McGraw currently holds. See W.Va.Code § 3–10–3 (1999) (setting forth procedures for filling judicial vacancies).

2. Justice McGraw is currently serving the remainder of a term on the West Virginia Supreme Court of Appeals to which he was elected as a result of the resignation of Justice Thomas E. McHugh in 1998. The term to which Justice McGraw has been elected ends on December 31, 2004.

3. See State ex rel. Rist v. Underwood, 206 W.Va. 258, 524 S.E.2d 179 (1999).

4. While we fully appreciate the gravity of the ethical concerns Relator has raised that arise from Justice McGraw's involvement in the proceedings which resulted in the nullification of Speaker Kiss' appointment to this body, we do not rely on such grounds to resolve this matter.

of the judiciary, as well as its equally-compelling interest in securing an independent judiciary removed from the entanglements of politics, all combine to require this Court to conclude that Justice McGraw cannot seek to enhance his term-length through these means. Accordingly, we grant the writ of mandamus as moulded.[5]

## I. Factual Background

The precipitating fact that spawned this petition was the filing of a certificate of candidacy by Justice McGraw via the U.S. Postal system on January 29, 2000. *See* W.Va. Code 3–5–7 (1999). Were it not for the fact that Justice McGraw is currently filling the remainder of an unexpired term,[6] which runs until December 31, 2004, the filing would not have been momentous. Due to the unprecedented nature of this filing, the press immediately began publishing commentary[7] on the issue of whether a supreme court justice could seek election to another term of court while still occupying an unexpired term on that same body. When Justice McGraw permitted the deadline for withdrawing his candidacy[8] to pass, Relator avers that he was prompted to file a request for extraordinary relief by virtue of Justice McGraw's failure to withdraw his name from the list of Democratic candidates seeking election to this Court. This Court granted the rule to show cause for the purpose of determining whether Justice McGraw's candidacy is in violation of the West Virginia Constitution or the general laws of this state.

## II. Standard of Review

 Typically, this Court considers whether to issue a writ of mandamus against the following three-pronged standard:

A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syl. Pt. 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969). Where challenges to the electoral process are involved, however, this Court has recognized the need to relax the stringent requirements for issuing writs of mandamus:

The public policies in protecting fundamental rights, preserving electoral integrity, and promoting both political and judicial economy have prompted a practical approach in assessing whether an election case is appropriate for mandamus relief.... It is only when a writ of mandamus has been invoked to preserve the right to vote or to run for political office that this Court has eased the requirements for strict compliance for the writ's preconditions, especially those relating to the availability of another remedy.

Syl. Pt. 3, in part, *State ex rel. Sowards v. County Comm'n*, 196 W.Va. 739, 474 S.E.2d 919 (1996); *accord* Syl. Pt. 2, *State ex rel. Bromelow v. Daniel*, 163 W.Va. 532, 258 S.E.2d 119 (1979) ("Because there is an important public policy interest in determining the qualifications of candidates in advance of an election, this Court does not hold an election mandamus proceeding to the same degree of procedural rigor as an ordinary mandamus case.")

 While we countenanced easing the standard for issuing extraordinary relief in the context of "preserving" the right to run for political office in *Sowards*, the issues raised in this case, although aimed at prohib-

---

**5.** Due to the exigent circumstances presented by the impending primary election and the attendant need to have Justice McGraw's name removed from the official ballots, ballot cards, ballot labels, and voting machines, this Court granted a writ of mandamus, as moulded, by order dated March 23, 2000. The order cursorily identified the basis for the relief granted, indicating that an opinion was to follow which would fully explain the Court's reasoning.

**6.** *See supra* note 2.

**7.** We reference the aspect of press coverage not as support for the decision reached in this case, but as commentary on the state of calumny that has beset this institution since Justice McGraw filed his pre-candidacy statement.

**8.** Pursuant to the provisions of West Virginia Code § 3–5–11(a) (1999), Justice McGraw could have withdrawn his certificate of candidacy until February 15, 2000. After such time, no candidate is permitted to remove his/her name from the ballot. *See id.*

iting a candidacy, suggest similar exigencies which require immediate, rather than deferred, resolution. Moreover, as we explained in *Bromelow,* "[t]he principal purpose of the liberalized election mandamus proceeding is to provide an expeditious pre-election hearing to resolve eligibility of candidates, so that voters can exercise their fundamental rights as to all eligible candidates." *Id.* at 536, 258 S.E.2d at 122; *see also State ex rel. Maloney v. McCartney,* 159 W.Va. 513, 527, 223 S.E.2d 607, 616 (1976) (stating that "intelligent and meaningful exercise of the franchise requires some method of averting a void or voidable election" and recognizing that "some form of proceeding must be available by which interested parties may challenge in advance of a primary or general election the eligibility of questionable candidates in order to assure that elections will not become a mockery. . . ."). That mandamus is the agreed-upon procedural mechanism for resolving questions of a candidate's eligibility is well-established:

> "The eligibility of a candidate for an elective office may be determined in a proceeding in mandamus and, upon a determination therein that a candidate is ineligible to be elected to or to hold the office for which he seeks nomination or election, a writ of mandamus will issue directing the board of ballot commissioners to strike or omit such candidate's name from the primary or general election ballot." Syl. pt. 1, *State ex rel. Summerfield v. Maxwell,* 148 W.Va. 535, 135 S.E.2d 741 (1964).

Syl. Pt. 1, *State ex rel. Haught v. Donnahoe,* 174 W.Va. 27, 321 S.E.2d 677 (1984). Against these principles, we examine Relator's request for a writ of mandamus.

### III. Discussion

As an initial matter, we feel constrained to observe that not once in the 137 years since this state's formation has any individual adopted a course of action such as that pursued here by Justice McGraw. No one has previously attempted to "switch seats" while already occupying a position on this Court,

the highest tribunal in this state. The absence of precedent for this audacious conduct is not limited to this state's jurisprudence, but similarly is lacking throughout the other fifty states, save one. Were it not for the thwarted aspirations of one other judge, we would be completely bereft of authority against which to examine Justice McGraw's novel approach to term extension.[9]

We are not unmindful of the fact that a differing viewpoint exists with regard to the authority of this Court to prohibit Justice McGraw from seeking another term on this judicial body based on the fact that our state constitution does not expressly proscribe such a candidacy. In anticipation of such reproach, we respond that this Court is obligated by its role as the arbiter of constitutional issues, as well as its duty to uphold the confidence reposed in the judiciary by this state's citizenry, to resolve the issue of Justice McGraw's candidacy. Concomitant to the sustained confidence of the public in the judiciary is the correlative responsibility that integrity must be the cynosure of all judicial endeavors, both actual and perceived. So crucial is the state's interest in maintaining the integrity of its judicial system that regulations or restrictions which temporally affect an officeholder's access to the ballot have been found to withstand constitutional challenge on this ground alone. *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). This recognized state interest in upholding the integrity of the judicial system, and the inherent and express power of this Court to control the political activities of all judicial officers, thus serve as both the predicate core of our decision and as the authority for the ruling itself.

### A. Constitutional and Statutory Provisions

■ We look first to the governing constitutional language found in article VIII, section seven to determine whether the legislative framers anticipated and addressed the situation with which we are confronted. The only language that addresses the issue of judicial candidacy states as follows:

---

**9.** As one astute legislator commented, Justice McGraw is seeking to renegotiate his contract

before the expiration of the contractual term.

No justice, judge or magistrate shall hold any other office, or accept any appointment or public trust, under this or any other government; nor shall he become a candidate for any elective public office or nomination thereto, except a judicial office; and the violation of any of these provisions shall vacate his judicial office.

While some advocates might contend, at first glance, that the constitutional language does in fact authorize the candidacies of incumbent judges, upon scrutiny it becomes clear that this proviso was not adopted with the concerns in mind presented by Justice McGraw's filing. It does not pertain to the question of his right to run for this particular judicial office as a term-enhancement maneuver.[10]

The language of article VIII, section seven, which permits a justice to become a candidate for judicial office without vacating his/her judicial seat is aimed at two interrelated concerns: preserving the separation of powers amongst the three branches of government and preventing judicial entanglements with politics. The insertion of this constitutional language through the Judicial Reorganization Amendment of 1974 is directed at "bar[ring] [judges] from continuing in office after they become candidates for any nonjudicial public offices." Robert M. Bastress, *The West Virginia Constitution* at p.213 (1995). These provisions were "designed to prevent both obstructive conflicts and judicial entanglements with politics." *Id.* The Montana Supreme Court, in discussing the purpose of its constitutional language on this subject,[11] stated: "The constitutional prohibition against judges seeking nonjudicial offices while still holding judicial office is but part of a general constitutional scheme declaring directly or indirectly the rights of office holders in all branches of government to seek other office while still holding office." *Committee for an Effective Judiciary v. State*, 209 Mont. 105, 679 P.2d 1223, 1228

(1984). In upholding the constitutional language that permits a judge not to forfeit office if he/she files for a judicial position, the Montana Supreme Court opined:

[T]he [Montana constitutional] delegates perceived a public benefit in opening up the judicial election process to judges who desired to move from lower courts to the district court and from district court to the supreme court, or from a justice on the supreme court to a chief justice on the supreme court.... To say that a judge forfeits his office if he files for a nonjudicial office is but another way of saying that a sitting judge can file for **other** judicial office without forfeiting his office.

679 P.2d at 1228–29 (emphasis supplied).

Undergirding the constitutional prohibition against seeking nonjudicial elective office is the correlative objective of both removing and insulating judges from the political realm. While the reasons for separating the judiciary from politics are many and varied, there can be no question that the goal of removing politics and its attendant imbroglios from the judicial process is necessary to the proper functioning of our judicial system. *See, e.g., Philyaw v. Gatson*, 195 W.Va. 474, 478, 466 S.E.2d 133, 137 (1995) (discussing consequences of judge defeated in bid for nonjudicial office returning to bench post-election); J. Clark Kelso, *A Report on the Independence of the Judiciary*, 66 S.Cal. L.Rev. 2209, 2210 (1993) (*"In order to perform its dispute-resolving and law-declaring functions, the judiciary must also be largely independent of, and insulated from, the people and the political process. It is only through this independence—an independence that promotes impartial decision making—that judicial action will earn the respect of the people."*) (emphasis supplied). It is not surprising then that the Code of Judicial Conduct includes a complementary re-

---

**10.** While Relator stated that he did not seek to force Justice McGraw to vacate his current seat on this Court under the terms of article VIII, section 7, the vacancy proviso is not implicated as it affects only judges who seek nonjudicial office.

**11.** Article VII, § 10 of the Montana Constitution, adopted in 1972, states that "[a]ny holder of a judicial position forfeits that position by either filing for an elective office rather than a judicial position or absenting himself from the state for more than sixty (60) consecutive days." *Committee for an Effective Judiciary v. State*, 209 Mont. 105, 679 P.2d 1223, 1224 (1984).

striction on "inappropriate political activity" which requires judges to "resign from judicial office upon becoming a candidate for a non-judicial office." W.Va.Code of Judicial Conduct, Canon 5A(2). In discussing the Washington corollary to Canon 5,[12] often referred to as a "resign-to-run" requirement, the Washington Supreme Court stated that this canon "seeks to prevent embroiling the court in political controversy and allowing a judge to trade on the prestige and dignity of the judicial office." *In re Disciplinary Proceeding Against Niemi,* 117 Wash.2d 817, 820 P.2d 41, 46 (1991) (citing J. Shaman, S. Lubet & J. Alfini, *Judicial Conduct and Ethics* § 11.19 at 357 (1990) and E. Thode, *Reporter's Notes to Code of Judicial Conduct* 97 (1973)); *see also Morial v. Judiciary Comm'n,* 565 F.2d 295, 305 (5th Cir.1977), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978) (articulating rationale for requiring resignation of judges seeking election to nonjudicial office in terms of "protect[ing] the state's interest in judicial integrity without sacrificing the equally important interests in robust campaigns for elective office in the executive or legislative branches of government").

Having thus concluded that the language of article VIII, section seven is directed at forcing judges to vacate their office if they intend to run for nonjudicial office and to similarly uphold the separation of powers by proscribing judicial officers from becoming candidates for either of the two remaining branches of government *while still holding* office, we next address whether the language at issue authorizes an incumbent justice to seek a separate seat on the court before his term has expired. The answer to this query cannot be reached by simply concluding that, because the office sought by Justice McGraw is a judicial office, he is permitted by the terms of article VIII, section seven to seek judicial office while still holding and fulfilling an unexpired judicial seat. While the dissent employs contorted logic in rewriting the language of article VIII, section seven to state in positive terms that "a sitting justice may 'become a candidate for any elective ... judicial office,'"[13] such reformulation is shallow and jurisprudentially indefensible. It neither withstands constitutional analysis nor does it answer the query before the Court. The words of Justice Story still ring true: "How easily men satisfy themselves that the Constitution is exactly what they wish it to be." Alpheus T. Mason & Donald G. Stephenson, Jr., *American Constitutional Law* 38 (10th ed.1993). If the course of action undertaken by Justice McGraw was not contemplated by either the framers of our state constitution or the drafters of the Judicial Reorganization Act of 1974, and we seriously doubt that it was,[14] then we cannot summarily conclude that such action is sanctioned under this constitutional provision. It is more reasonable to find that this behavior is simply outside the express terms of our social compact. As we recognized in *Randolph County Board of Education v. Adams,* 196 W.Va. 9, 467 S.E.2d 150 (1995), "[w]hen the Constitution is silent on a particular issue, the solution cannot be found in a methodology that requires us to assume or divine the framers' intent on an issue which most likely was never considered." *Id.* at 22, 467 S.E.2d at 163.

Finding no explicit constitutional authority for Justice McGraw's candidacy[15] and reject-

---

**12.** Canon 7(A)(3) of the Washington Code of Judicial Conduct provides that;

Judges shall resign their office when they become candidates either in a party primary or in a general election for a nonjudicial office, except that they may continue to hold their judicial office while being a candidate for election to or serving as a delegate in a state constitutional convention, if they are otherwise permitted by law to do so.

*In re Disciplinary Proceeding Against Niemi,* 117 Wash.2d 817, 820 P.2d 41, 45 (1991).

**13.** This language is included by the dissent in the order issued by this Court on March 23, 2000.

**14.** We have found no authority, and similarly been cited to none by the parties hereto, that demonstrates any historical contemplation was given to the issue of whether an incumbent on this Court whose term has not expired could seek election to another seat on this Court.

**15.** Given our conclusion that no constitutional language addresses the right of an incumbent justice to seek election mid-term to another term on this Court, we do not find applicable the authority which requires that "[i]n the event of ambiguity a constitutional amendment will receive every reasonable construction in favor of eligibility for office ...." Syl. Pt. 3, in part, *State ex rel. Maloney v. McCartney,* 159 W.Va. 513, 223

ing summarily the dissenter's contention that the absence of express constitutional prohibition conversely warrants approval of such candidacy, we must determine whether any statutes bear on the issue of Justice McGraw's eligibility to be a candidate for another seat on this Court. The only statutory provision which addresses the critical element of eligibility for office is West Virginia Code § 3–5–7. That statute, which applies to all candidacies, requires the filing of a certificate of candidacy announcement by "[a]ny person who is **eligible** and seeks to hold an office or political party position to be filled by election in any primary or general election." *Id.* (emphasis supplied). As part of the candidacy announcement, the individual is required to make a sworn statement that he/she "is a candidate for the office in good faith." W.Va.Code § 3–5–7(b)(8). Other than emphasizing the obvious—that an individual seeking political office must be eligible to hold the office he/she seeks—the language of this general election statute does not assist us with our present inquiry.

### B. Analogous Precedent

Despite multitudinous research efforts, only one factually similar decision was unearthed that involved a judicial officer who sought to enhance his term length while still fulfilling a term to which he had been elected. In *Hurowitz v. Board of Elections*, 53 N.Y.2d 531, 443 N.Y.S.2d 54, 426 N.E.2d 746 (1981), a sitting civil court judge, who had served less than half of the ten-year term to which he had been elected, filed as a candidate for another ten-year seat on the same judicial body. Like Justice McGraw, Judge Hurowitz asserted his right to seek a separate judicial seat on the same court based on the language of New York's corollary to article VIII, section 7 of our state constitution. Citing the language of article VI, section 20 of the New York Constitution, which provided that "a Judge may not 'be eligible to be a candidate for any public office other than judicial office ... unless he resigns his judicial office,'" Judge Hurowitz argued that the quoted constitutional language "not only per-

mits members of the judiciary to retain their positions while they pursue vacancies on *other* courts, but also sanctions sitting Judges whose terms have not yet expired to be candidates for identical positions on the *same* court." 443 N.Y.S.2d 54, 426 N.E.2d at 747. In rejecting Judge Hurowitz's postulate, the New York court examined the entirety of the language of article VI in which the subject constitutional language was located to determine the underlying general intent of the article.

"When the whole sixth (or judiciary) article of the Constitution is considered, certain purposes are clearly indicated. It was proposed to provide for the State a general and complete and continuous judicial system, and to create, or recognize and continue, all the judicial officers needed therefor .... It was designed that the general and * * * the exclusive mode of filling these offices * * * should be by election by the people, and not by appointment."

443 N.Y.S.2d 54, 426 N.E.2d at 747 (quoting *People ex rel. Jackson v. Potter*, 47 N.Y. 375, 379–80 (N.Y.Sup.Ct.1872)). In light of the historical underpinnings of the judiciary article, the court in *Hurowitz* concluded that

article VI was designed to assure a structured judiciary elected on a regular basis without fragmentation of terms. To accept this candidate's interpretation of section 20 would defeat the over-all purposes of article VI. Such activities could fragment terms and create interim vacancies on a regular basis, thereby infringing upon the people's right to a "complete and continuous judicial system".

443 N.Y.S.2d 54, 426 N.E.2d at 748 (quoting *Potter*, 47 N.Y. at 379).

Besides its concerns over fragmentation and the consequent disruption to the judicial process, the court in *Hurowitz* considered the logical consequences of the judge's candidacy on the selection of judges:

[T]he nature of the Judge's candidacy could have the effect of aborting the election process. By seeking another position on the same court where he currently sits,

S.E.2d 607, *appeal dismissed sub nom. Moore v. McCartney*, 425 U.S. 946, 96 S.Ct. 1689, 48

L.Ed.2d 190 (1976).

he not only allows himself multiple chances to be re-elected, but also assures that when he is elected to the other position on the same court, a vacancy will occur. Such a vacancy creates an additional occasion for political involvement. Moreover, should this type of conduct become the norm, it would be possible that all positions would be appointive upon the resignations and shiftings of the other Judges; only at the next general election would the people be given a chance to vote, the effect of which may well be to merely approve the appointment. Although we do not find that this is currently the practice, the likelihood of such a result portends abuse of the elective system. Even viewed in its most favorable light, this conduct has the potential for "mischief" which this court cannot condone.

443 N.Y.S.2d 54, 426 N.E.2d at 748. Long before the *Hurowitz* decision, the New York Supreme Court was forced to consider, in its *Potter* decision of 1872, the effects necessarily wreaked upon the electoral process when judicial appointments are required due to politically-motivated vacancies.[16]

> "If a vacancy in a term ... may defeat the electors of their privilege to choose an incumbent ..., so a resignation ... during the running of the term will have the same effect. More than that too, the appointee of the Governor, ... may ... resign his office, and then a vacancy again occurs, to be again filled by appointment for a like fractional term.... **And this succession of appointment and resignation, and resignation and appointment, may be kept up as long as the judicial and executive servants of the people may be willing to act in it. Thus would the electors be permanently defeated in the exercise of their constitutional privilege of choice.** It needs not to name all the evils which would thus result. It is sufficient to say,

that it would work an entire perversion of the spirit and general intent of the judiciary article[.]"

*Potter*, 47 N.Y. 375, 1872 WL 9733 at p.3 (emphasis supplied).

The potential for public backlash to this type of candidacy was fully appreciated by the court in *Hurowitz:* "Not without significance in this connection is the risk of the appearance of impropriety that may be perceived by the public in a Judge's injection of himself into the political process **for the sole purpose of extending his tenure.**" 443 N.Y.S.2d 54, 426 N.E.2d at 748 (emphasis supplied). Such injection into the political process, according to the court in *Hurowitz*, was contrary to the intent of the constitutional framers to "minimize the involvement of the judiciary in the political process and the possible influences such exposure might bring with it." *Id.* With this sentiment, we heartily agree.

### C. Fundamental Right to Candidacy

█ Despite the compelling nature of the rationale employed by the *Hurowitz* court in forcing Judge Hurowitz to withdraw his name from the ballot, we must proceed to examine whether Justice McGraw has a fundamental right to candidacy which prevents this Court from similarly foreclosing his candidacy. Beginning with this Court's decision in *State ex rel. Brewer v. Wilson*, 151 W.Va. 113, 150 S.E.2d 592 (1966), *overruled on other grounds, Marra v. Zink*, 163 W.Va. 400, 256 S.E.2d 581 (1979), we have recognized that the " 'right to become a candidate for election to public office is a valuable and fundamental right.' " 151 W.Va. at 121, 150 S.E.2d at 597 (quoting 29 C.J.S. *Elections* § 130 at 377); *accord Marra v. Zink*, 163 W.Va. 400, 403, 256 S.E.2d 581, 584 (1979); *State ex rel. Piccirillo v. City of Follansbee*, 160 W.Va. 329, 333–34, 233 S.E.2d 419, 423 (1977).[17] In syllabus point two of *State ex*

---

**16.** When a supreme court justice resigned from the bench on the eve of the general election and an appointment resulted due to the vacancy created, the New York Supreme Court had to determine whether the term of the appointed justice was a 12–year term or whether the appointment ended on December 31st of that very same year due to the selection of a justice at the general election. *Potter*, 1872 WL 9733 at pp. 1–2.

**17.** The United States Supreme Court has adopted a different approach to the issue of whether there is a fundamental right to be a candidate for public office. In *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982), the Court stated that "[f]ar from recognizing candidacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close

*rel. Billings v. City of Point Pleasant,* 194 W.Va. 301, 460 S.E.2d 436 (1995), we held that "[t]he West Virginia Constitution confers a fundamental right to run for public office, which the State cannot restrict unless the restriction is necessary to accomplish a legitimate and compelling governmental interest."

### D. Additional Qualification

■ Before proceeding to analyze whether there is a legitimate and compelling state interest that would justify prohibiting Justice McGraw's candidacy, we must digress to consider Justice McGraw's contention that what Relator seeks is to impose an additional qualification for the office of supreme court justice. The quintessence of Justice McGraw's defense to the relief sought by Relator is that any ruling which prohibits his candidacy amounts to the imposition of a constitutionally-prohibited qualification for this Court.[18]

Justice McGraw argues that Relator erroneously seeks to use his incumbency as a justice serving an unexpired term as a roadblock to candidacy.

■ We do not take issue with Justice McGraw's assertion that this Court cannot impose qualifications for the office of supreme court justice in addition to those enumerated in article VIII, section 7. *See supra* note 18. It is axiomatic that the qualifications necessary to seek office as a supreme court justice are those which are prescribed by the constitution. *See* W.Va. Const. art. VIII, § 7. While understandable in terms of advocacy, Justice McGraw's attempt to "dress" his incumbency in qualification clothing does not withstand scrutiny. What Relator seeks is not the insertion of an additional qualification for office, but instead a limitation on when a sitting supreme court justice is eligible to seek reelection to this body. Far from being a distinction of semantical

scrutiny.' " *Id.* at 963, 102 S.Ct. 2836. Explaining further, the Court stated:

> Decision in this area of constitutional adjudication is a matter of degree, and involves a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions.

*Id.; see also In re Advisory from Governor,* 633 A.2d 664, 669 (R.I.1993) ("To the extent that ... [a prior state] decision ... identified candidacy for public office as a fundamental right, those beliefs must be revisited in light of *Clements v. Fashing.*")

While states generally have broad power to determine issues pertinent to the electoral process, any such requirements imposed by states cannot violate the Equal Protection Clause. *See Bullock v. Carter,* 405 U.S. 134, 141, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). Rejecting the traditional strict scrutiny form of analysis applied to equal protection issues, the Supreme Court ruled in *Clements* that classifications affecting an individual's ability to seek elective office survive constitutional scrutiny provided they are "drawn in such a manner as to bear some rational relationship to a legitimate state end." 457 U.S. at 963, 102 S.Ct. 2836.

In its recent decision concerning the constitutionality of state-imposed term limits on Congressional representatives, *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995), the United States Supreme Court noted that the Texas constitutional ["resign-to-run"] provision, which it upheld in *Clements,* was "a permissible attempt to regulate state officeholders" and referenced its exhortation in

*Clements* that "[a]ppellees are *elected* state officeholders who contest restrictions on partisan political activity." 514 U.S. at 835 n. 48, 115 S.Ct. 1842 (emphasis in original). Historically, the Supreme Court has upheld electoral restrictions affecting both public officeholders and various classifications of civil servants. *Thornton,* 514 U.S. at 835 n. 48, 115 S.Ct. 1842; *Clements,* 457 U.S. at 972, 974 n. 1, 102 S.Ct. 2836 (Stevens, J., concurring in part and concurring in judgment) ("The fact that appellees hold state office is sufficient to justify a restriction on their ability to run for other office that is not imposed on the public generally."); *see United States Civil Serv. Comm'n v. National Ass'n of Letter Carrriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (upholding provisions that required dismissal of civil servants who became political candidates), *superceded by statute as stated in Bauers v. Cornett,* 865 F.2d 1517 (8th Cir.1989); *accord United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (upholding Hatch Act provisions which prohibited civil service employees from seeking election to public office); *see also Joyner v. Mofford,* 706 F.2d 1523, 1528 (9th Cir.1983) (observing, in upholding Arizona resign-to-run statute, that "burden on candidacy ... is indirect and attributable to a desire to regulate state officeholders and not to impose additional qualifications to serving in Congress"), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983).

18. *See* W.Va. Const. art. VIII, § 7 (setting forth two qualifications for supreme court justices—admission to practice law for ten years prior to election).

significance only, the foundation for imposing a restriction on eligibility for seeking judicial office is well entrenched in this state's jurisprudence.

In *State ex rel. Haught v. Donnahoe,* 174 W.Va. 27, 321 S.E.2d 677 (1984), this Court was presented with the issue of a judicial candidate's eligibility for circuit court through a petition seeking a writ of mandamus. At issue was an interpretation of the language of article VIII, section 7, which requires that to be elected to circuit court judge, an individual must "ha[ve] been admitted to practice law for at least five years prior to his election." W.Va. Const. art. VIII, § 7. The specific issue presented was whether the five-year law practice requirement entailed that such practice had to have been performed within the confines of this state. The judicial candidate whose candidacy was being challenged had practiced law only in the State of California. 174 W.Va. at 29–30, 321 S.E.2d at 679–80. After first determining that an ambiguity was presented by the language at issue, this Court proceeded to analyze the reasons for requiring judicial candidates to have practiced before the respective bar of the state in which they sought office. "[R]ecogniz[ing] that the regulation of the practice of law and the judiciary is traditionally and inherently intraterritorial," we concluded that there were valid reasons for requiring that the constitutionally-imposed period of law practice had to have been performed in this state. *Id.* at 32–34, 321 S.E.2d at 682–84.

After interpreting the law-practice requirement as encompassing a non-existent, but necessary element of in-state practice, the Court proceeded to consider whether its interpretation could withstand equal protection analysis. Recognizing that this court-created restriction upon eligibility could only satisfy the constitutional protections inherent to the fundamental right to become a candidate for public office if it served a compelling state interest, we reasoned:

As previously noted, similar experi[ ]ent[i]al requirements for judges are common. The purpose for such requirements is unquestionably clear. They are intended to insure not only that judges are competent in the law, but that they are reasonably familiar with the law of the jurisdiction to which they are elected. While it may be axiomatic that judges are elected to interpret and uphold the law, due process demands a high level of jurisdictional competence and integrity in that endeavor. Requirements or restrictions affecting eligibility for judicial office that reasonably strive to meet such valid public purposes do not impose impermissible barriers to such offices. Furthermore, a state's particular interest in maintaining the integrity of its judicial system can support restrictions which could not survive constitutional scrutiny if applied to other types of offices. *Clements v. Fashing,* 457 U.S. 957, 968, 102 S.Ct. 2836, 2846, 73 L.Ed.2d 508, 519 (1982).

Therefore, we hold that the requirement contained in West Virginia Constitution art. VIII, § 7, that candidates for the office of circuit judge must have been admitted to the practice of law in the State for five years prior to their election advances the State's compelling interest in securing and maintaining a judiciary well qualified in the law of the jurisdiction.

174 W.Va. at 34, 321 S.E.2d at 684.

In *State ex rel. Summerfield v. Maxwell,* 148 W.Va. 535, 135 S.E.2d 741 (1964), the case in which we first determined that issues of a candidate's eligibility could be resolved through mandamus, this Court was asked to resolve whether a non-lawyer was eligible for the office of prosecuting attorney in the absence of a specific constitutional or statutory provision requiring county prosecutors to be lawyers licensed to practice in this state. Before concluding that the non-attorney was not eligible for election to the position of county prosecutor, this Court considered both the law of other states and the strong policy grounds in support of such a ruling. *Id.* at 543–51, 135 S.E.2d at 747–51. Of critical import to the Court's decision in *Maxwell* was the inherent power of the judiciary to regulate the practice of law. *See id.* at 550, 135 S.E.2d at 750 (citing *In re Eary,* 134 W.Va. 204, 58 S.E.2d 647 (1950)) (holding

that Supreme Court has inherent power to grant or refuse the right to practice law).[19]

■ Just as this the Court has the inherent power to regulate the practice of law so too does it have the inherent power to regulate the judiciary. *See* W.Va. Const. art. VIII, § 8 (setting forth "inherent rule-making power" of supreme court of appeals). In examining whether a judicial employee was subject to the "resign-to-run" requirement of article VIII, section 7 of our state constitution, this Court began its analysis in *Philyaw v. Gatson*, 195 W.Va. 474, 466 S.E.2d 133 (1995), with an examination of the constitutional framework of article VIII.

West Virginia Constitution article VIII is devoted entirely to the powers and function of the judicial branch of government. *Since the powers and functions, and indeed the entire structure, of the judicial branch are unique and unlike any other department of government, the rules regulating those powers and functions must, of necessity, be adapted to recognize those differences. The very soul of the judicial branch of government is that on a systemic basis, the judiciary must maintain both actual and perceived impartiality:*

> It is the design of the law to maintain the purity and impartiality of the courts, and to insure for their decisions the respect and confidence of the community.... After securing wisdom and impartiality in their judgments, it is of great importance that the courts should be free from reproach or the suspicion of unfairness.

*See Forest Coal Co. v. Doolittle,* 54 W.Va. 210, 227, 46 S.E. 238, 245 (1903) (emphasis omitted) (quoting with approval *Oakley v. Aspinwall,* 3 N.Y. 547, 552 (1850).)

*Gatson,* 195 W.Va. at 477, 466 S.E.2d at 136 (emphasis supplied). Continuing in this vein, we observed:

> Justice Frankfurter, dissenting in *Baker v. Carr,* may have said it best, "[t]he Court's authority—possessed of neither the purse nor the sword—ultimately rests

on sustained public confidence in its moral sanction." *Baker v. Carr,* 369 U.S. 186, 267, 82 S.Ct. 691, 737–38, 7 L.Ed.2d 663 (1962). *This moral sanction, which is the underpinning of the public confidence in our judicial system is at the heart of West Virginia Constitution article VIII, section 7* . . . .

195 W.Va. at 477, 466 S.E.2d at 136 (emphasis supplied).

As an aid to resolving the issue of whether judicial employees are subject to the constraints of the "resign-to-run" provision of article VIII, section 7 in *Gatson,* this Court examined how the duties of judicial employees are necessarily intertwined with the judicial objectives of assuring "independence, impartiality, and public confidence in the court system." 195 W.Va. at 478, 466 S.E.2d at 137. Discussing the inevitable encroachment on "the integrity of the judicial system" that would result from permitting judicial employees to continue in office while seeking non-judicial office, we identified as "legitimate public objectives": "[e]nsuring the impartiality of court employees, protecting the integrity and appearance of impartiality of court offices, and preserving the division of powers set out in West Virginia Constitution article V, section 1." *Id.* at 478, 466 S.E.2d at 137.

Continuing with the issue of whether prohibition of an incumbent justice's attempt to seek election mid-term amounts to the imposition of an additional qualification, we find useful the discussion in *Gatson* concerning whether the "resign-to-run" requirement amounted to an unconstitutional qualification for candidates seeking office. We explained in *Gatson* why *Marra,* a decision in which this Court found that a municipal charter provision had wrongly imposed an additional qualification of one year of residency in contravention of the constitutionally-provided qualifications for non-judicial office,[20] was not determinative of the issue before the Court:

> We believe that the circuit court's reliance on *Marra* is misplaced *since the resign-to-run rule does not impose an additional qualification on a candidate. The*

---

**19.** *See also* W.Va.Code § 30–2–1(1998) (granting Supreme Court power to grant or deny applicant's license to practice law).

**20.** *See* W.Va. Const. art. IV, § 4.

employer did not alter the qualifications necessary to run for office, but rather established requirements for retaining employment. The claimant's employment was conditioned upon a reasonable restriction, which because of the unique nature of the employment would not be imposed on employees in the private sector. This extension of the resign-to-run requirement to judicial employees is designed as a prophylactic measure to protect the entire judicial branch. This rule is a legitimate and independent condition of claimant's continued employment with the Judiciary. We hold the restriction on judicial employees requiring their resignation upon becoming a candidate for a non-judicial office is reasonable.

195 W.Va. at 478–79, 466 S.E.2d at 137–38 (emphasis in original omitted and emphasis supplied).

Like the circuit court in *Gatson*, Justice McGraw has wrongly relied on *Marra* as controlling of the outcome of this case. Contrary to the position advanced by Justice McGraw, no additional qualification for office will be imposed by restricting when a sitting supreme court justice, whose term has not expired, may seek a new term on this Court. The fundamental qualifications required to seek a seat on this Court [21] are not affected by prohibiting Justice McGraw from seeking a second seat on this judicial body at this juncture in his currently unfulfilled term. What this Court is being forced to do, solely in response to the unprecedented candidacy undertaken by Justice McGraw, is to impose a restriction which affects eligibility for election to this body, *not* the qualifications for holding a seat on this tribunal. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 & n. 9, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (recognizing that while regulations affecting elections necessarily have some effect on right to vote, "[n]evertheless, the State's im-

portant regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions" and noting "[w]e have also upheld restrictions on candidates eligibility that serve legitimate state goals ... unrelated to First Amendment values") (citing *Clements*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508).

■ While Justice McGraw vociferously contends that a prohibition of his candidacy necessarily conflicts with and violates either his right to be a candidate or the electorate's right to vote for the candidate of their choice, what he fails to acknowledge is that "[n]either the right to candidacy nor franchise, however, are immune from regulation." *Sowards*, 196 W.Va. at 747, 474 S.E.2d at 927. The regulation of the electoral process has its genesis in the irrefutable need to impose "order, rather than chaos" in the democratic process. *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Arising from this state interest in "preserving the integrity and reliability of ... the electoral process" is the corresponding "authority to prescribe reasonable rules for the conduct of elections, reasonable procedures by which candidates may qualify to run for office, and the manner in which they will be elected." *Sowards*, 196 W.Va. at 747, 474 S.E.2d at 927.

In upholding a Texas constitutional provision that prohibited judges from eligibility for legislative office "during the term for which he is elected or appointed" [22] on equal protection grounds, the United States Supreme Court relied on the state's interest in maintaining the integrity of the judicial system. *Clements*, 457 U.S. at 960, 102 S.Ct. 2836. The judge affected by this provision was a justice of the peace, who was in the midst of serving a four-year term. Analyzing the burden [23] placed on the judge who

---

**21.** *See supra* note 18.

**22.** The Court in *Clements* also upheld a separate constitutional provision which required resignation of a wide range of state and county officeholders if they became a candidate for state or federal office "other than the office then held." 457 U.S. at 960, 102 S.Ct. 2836 (quoting Tex. Const. art. XVI, § 65).

**23.** Rejecting traditional equal protection analysis which requires strict scrutiny to uphold classifications, the Court determined "that this sort of insignificant interference with access to the ballot need only rest on a rational predicate in order to survive a challenge under the Equal Protection Clause." 457 U.S. at 968, 102 S.Ct. 2836.

sought to hold legislative office, the Court reasoned:

> Section 19 merely prohibits officeholders from cutting short their current term of office in order to serve in the legislature. In Texas, the term of office for a Justice of the Peace is four years, while legislative elections are held every two years. Therefore, § 19 simply requires [Judge] Baca to complete his 4–year term as Justice of the Peace before he may be eligible for the legislature. At most, therefore, Baca must wait two years—one election cycle—before he may run as a candidate for the legislature.
>
> . . . .
>
> In establishing a maximum "waiting period" of two years for candidacy by a Justice of the Peace for the legislature, § 19 places a *de minimus* burden on the political aspirations of a *current* officeholder. Section 19 discriminates neither on the basis of political affiliation nor on any factor not related to a candidate's qualifications to hold political office. . . . In this case, § 19 burdens only a candidate who has successfully been elected to one office, but whose political ambitions lead him to pursue a seat in the Texas Legislature.

457 U.S. at 966–67, 102 S.Ct. 2836 (citation omitted and footnote omitted). The Court emphatically stated: "A 'waiting period' is hardly a significant barrier to candidacy." *Id.* at 967, 102 S.Ct. 2836.[24]

The Court in *Clements* had no difficulty in identifying the rational predicate for section 19:

> That provision furthers Texas' interests in maintaining the integrity of the State's Justices of the Peace. By prohibiting candidacy for the legislature until completion of one's term of office, § 19 seeks to ensure that a Justice of the Peace will neither abuse his position nor neglect his duties because of his aspirations for higher office. *The demands of a political campaign may tempt a Justice of the Peace to devote less than his full time and energies to the responsibilities of his office. A campaigning Justice of the Peace might be tempted to render decisions and take actions that might serve more to further his political ambitions than the responsibilities of his office. The State's interests are especially important with regard to judicial officers. It is a serious accusation to charge a judicial officer with making a politically motivated decision.* By contrast, it is to be expected that a legislator will vote with due regard to the views of his constituents.
>
> Texas has a legitimate interest in discouraging its Justices of the Peace from vacating their current terms of office. By requiring Justices of the Peace to complete their current terms of office, the State has eliminated one incentive to vacate one's office prior to the expiration of the term. *The State may act to avoid the difficulties that accompany interim elections and appointments.*

457 U.S. at 968, 102 S.Ct. 2836 (footnote omitted and emphasis supplied).[25] As articulated by our nation's highest Court, the burdens placed upon the judiciary which result from political activities necessitated by the election and reelection process serve to undergird the necessity for our ruling that campaigns by judicial officers be kept to a minimum.

█ Counsel for Justice McGraw suggests repeatedly in his brief that if this Court rules in any fashion which defeats his candidacy, such ruling can be motivated only by political, non-legal bias of the members of this Court. Such assertions, besides being inaccurate, are both insulting and grossly

---

24. The Court's determination that a "waiting period" was not a significant burden does not appear to have been prompted by the relatively short two-year period involved as the Court simultaneously referred to its decision in *Chimento v. Stark*, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973), in which it upheld a seven-year durational residency requirement for candidacy in New Hampshire. *Clements*, 457 U.S. at 967–68, 102 S.Ct. 2836.

25. Included in its rationale was the comment that "[t]he State's particular interest in maintaining the integrity of the judicial system could support § 19, even if such a restriction could not survive constitutional scrutiny with regard to any other officeholder." *Clements*, 457 U.S. at 968 n. 5, 102 S.Ct. 2836.

unprofessional. The West Virginia Constitution confers on the West Virginia Supreme Court of Appeals, both expressly and by necessary implication, the power to protect the integrity of the judicial branch of government and the duty to regulate the political activities of all judicial officers.

### E. Compelling State Interest

■ Against both state and federal precedent, we examine whether this state has a compelling interest which permits it to grant the relief requested by Relator based on Justice McGraw's status as a current office-holder of this Court. Both Relator and this Court have identified multiple bases for concluding that the state has a compelling interest in prohibiting an incumbent justice whose term has not expired from seeking election to another term on this body. In addition to maintaining the integrity of the judiciary, the state also has a valid interest in assuring the public an independent and impartial judiciary, minimizing the involvement of the judiciary in the political process, upholding the constitutionally-delegated method of selecting supreme court justices, and ensuring that the judiciary can sustain the critical and unique element of collegiality necessary to the decision-making process of this Court. Collectively, these legitimate state interests combined with the judiciary's inherent power to regulate itself, compel the conclusion that no person who is serving a term as a justice of the Supreme Court of Appeals of this state shall be eligible to file as a candidate to seek nomination or election to another term on said Court which begins prior to the expiration of the term then being served.

■ Addressing these legitimate state interests individually, we first consider the primary interest at stake here—upholding the integrity of the judiciary. It is beyond dispute, based on the pronouncements in *Clements*, that regulations or restrictions affecting candidacy in the form of ballot access can withstand constitutional scrutiny when those ballot limitations are established for the purpose of maintaining the integrity of the judiciary. 457 U.S. at 960, 102 S.Ct. 2836. This Court previously adopted the rationale employed in *Clements* when we interpreted the

constitutional requirement concerning the qualifications necessary for eligibility to seek judicial office as a circuit court judge in *Donnahoe*. *See* 174 W.Va. at 33–34, 321 S.E.2d at 684. It is equally beyond dispute that the action of Justice McGraw in seeking to "switch seats" mid-term has impugned the character of this judicial body. Similarly above discussion is the importance of preserving the integrity of the judicial system. *See* W.Va.Code of Judicial Conduct, Canon 1. As one wise jurist has expounded, "The need to preserve judicial integrity is more than just a matter of judges satisfying themselves that the environment in which they work is sufficiently free of interference to enable them to administer the law honorably and efficiently. Litigants and our citizenry in general must also be satisfied." *Hobson v. Hansen*, 265 F.Supp. 902, 931 (D.D.C.1967) (Wright, J., dissenting). When an individual seeks so obviously to advance his personal interests through such an unorthodox and previously uncharted method of term-enhancement, it cannot be gainsaid that public sentiment would quickly conclude that this action is not deserving of a justice sitting on this court of last resort.

The state's interests in assuring the independence and impartiality of the judiciary and minimizing the involvement of the judiciary in the political process go hand in hand. It is axiomatic that a judiciary can properly function only when it acts independent of all extraneous influences or interests, whether political or otherwise. Critical to understanding the imperative that the judiciary be separated from politics, other than as may be required for the purpose of elections, is an appreciation of the dangers presented by commingling politics with the judiciary. The *Hurowitz* court instinctively recognized the inimical effects that unnecessary exposure to the political process would have on the judiciary. *See* 443 N.Y.S.2d 54, 426 N.E.2d at 748. Judges have to guard against the public perception that involvement in the political process subjects them to the influences of those who help secure their elections. Here, as in other instances of judicial conduct, it is not only the accuracy of an allegation of impropriety that warrants concern, but, significantly, it is even the mere appearance of

impropriety that has the capability of signaling disastrous results for the judiciary as an institution. As recognized by the Supreme Court of Washington in *Niemi*, "[p]ublic confidence is undermined when the 'citizenry conclude[s], even erroneously, that cases [are] decided on the basis of favoritism or prejudice rather than according to law and fact.'" 820 P.2d at 44 (quoting J. Shaman *et al., Judicial Conduct and Ethics* § 10.03 at 275). Consequently, the judicial system must be ever vigilant with regard to the public's perception of the improper infusion of politics within its courts.

Perhaps the most obvious and compelling reason why Justice McGraw's candidacy should not be permitted arises from the effects that a mid-term candidacy has on the court system as a whole. As fully-explored by the New York courts in both *Hurowitz* and *Potter*, the electoral method of judge selection is abrogated by requiring, perhaps *ad infinitum*, that judges be placed on a court via the appointment process when contrived judicial vacancies occur. *See Hurowitz*, 443 N.Y.S.2d 54, 426 N.E.2d at 748, *Potter*, 47 N.Y. 375, 1872 WL 9733 at p.3. The evils that could be attempted through such "forced" judicial vacancies are easily perceived. Notwithstanding the patent circumvention of the electoral process, the disruption to the operations of this Court would be catastrophic were we to permit Justice McGraw, and consequently every present and future sitting justice desirous of following suit, to jump into the election fray, irrespective of when the term being filled by that individual expires.[26]

Finally, we would be less than forthright if we did not acknowledge the effects this candidacy has had on the ability of this Court to conduct its constitutionally-required duties with the element of collegiality necessary to properly effect judicial decision-making. While the process of judicial decisions implies disagreement, it also implies that the parties to such decisions must approach dispassionately the business of dispute resolution without personal animosity and with a healthy respect for honest differences of opinion. Unfortunately, this candidacy has brought with it an unhealthy pall of partisanship.[27] The author of this opinion has experienced first-hand that the loss of collegiality can only serve to promote disharmony and impede rational discourse.

We do not conclude that Justice McGraw is ineligible to be a candidate based on lack of qualifications. *See* W.Va. Const. art. VIII, § 7. Instead, his ineligibility arises from the State's compelling and permissible interest in regulating the political activities of its judicial officeholders. *See Clements*, 457 U.S. at 968, 102 S.Ct. 2836; *Donnahoe*, 174 W.Va. at 33–34, 321 S.E.2d at 684; *see also Joyner v. Mofford*, 706 F.2d 1523, 1531 (9th Cir.), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983) (rejecting argument that fourth qualification for office was being imposed by Arizona "resign-to-run" provision "because it does not prevent an elected state officeholder from running for federal office" and justifying this "indirect burden on potential candidates for Congress" as permissible regulation of state officeholders); *Signorelli v. Evans*, 637 F.2d 853, 859 (2d Cir.1980) (upholding law requiring state judges to resign from judiciary before seeking federal Congressional office as permissible regulation of judiciary and suggesting that unconstitutional additional qualification is obviated where regulation "is designed to deal with a subject within traditional state authority").[28]

---

**26.** Were this Court to sanction Justice McGraw's candidacy, we would be setting in place a mechanism that would allow judicial seats to be continually up for grabs by those already sitting on this body, whether for the sole purpose of term-enhancement or as a means of defeating the reelection of a particular justice. Whatever the objective, no one can seriously doubt the folly inherent to the establishment of such a "revolving-door" method of justice selection. Where would it end? We fear that the end result would be the utter and complete demise of the public's confidence in its judicial system.

**27.** This was further evidenced by the lengthy colloquy engaged in by the dissenter prior to the oral argument of this case. That discourse made clear that, regardless of the substance of this opinion, the dissenter refuses to believe that the majority has not wrongly based its ruling on perceived political leanings.

**28.** Both *Joyner* and *Signorelli* were cited with approval by the United States Supreme Court in *U.S. Term Limits* as additional authority for the permissible regulation of state officeholders. *See* 514 U.S. at 835 n. 48, 115 S.Ct. 1842.

Given our explicit and implicit regulatory powers over the judiciary, we are required to resolve this unprecedented, and clearly unanticipated by either the constitutional framers or our legislature,[29] issue of an incumbent justice's authority to seek another seat on the same judicial body while currently serving an unexpired term. Because of the constitutional and statutory void, and because of the pressing need to resolve this issue, this Court was forced to formulate a rule that addresses the propriety of an action which *never* had been attempted during the history of this state.

■ We wish to emphasize that our decision does not stand in conflict with the "critical postulate that sovereignty is vested in the people, and that sovereignty confers on the people the right to choose freely their ... [elected officials] ...." *U.S. Term Limits*, 514 U.S. at 795, 115 S.Ct. 1842. The fundamental principles of representative democracy have not been altered by this decision. No impermissible barrier to candidacy has been erected by this decision. Justice McGraw simply has to wait until the expiration of his current term and then he may properly avail himself of the electoral process with no consequent harm to this state's judicial system.[30] "To conclude otherwise might sacrifice the political stability of the system of the State, with profound consequences for the entire citizenry, merely in the interest of [a] particular candidate[ ] and ... [his] supporters having instantaneous access to the ballot." *Storer*, 415 U.S. at 736, 94 S.Ct. 1274.

We come to the end of this case with a profound respect for our constitutionally-proscribed responsibilities and an equally healthy regard for our historical, institutionally-mandated obligations to protect the structural integrity of this Court and to apply the terms of our constitution in a manner which comports with common sense and which promotes the public weal.

Based on the foregoing, the writ of prohibition is granted as moulded and the Clerk of the Court is hereby directed to issue forthwith the mandate for this case.

Writ granted as moulded.

Chief Justice MAYNARD, Justice DAVIS, and Justice McGRAW, deeming themselves disqualified, did not participate in the decision in this case.

Judge FRANK E. JOLLIFFE, Judge FRED L. FOX, II, and Judge THOMAS H. KEADLE sitting by temporary assignment.

Justice STARCHER dissents and files a dissenting Opinion.

STARCHER, Justice, dissenting.
(Filed Dec. 14, 2000)

The majority opinion unconstitutionally steals from the voters of West Virginia the right to decide whether or not *they, the voters,* would elect a qualified, eligible candidate—Justice Warren McGraw—to a 12–year seat on our Supreme Court of Appeals.[1]

**29.** While Justice McGraw contends that the legislature has implicitly found authority for his actions as demonstrated by its recent consideration of legislation aimed at preventing future candidacies by incumbent officeholders serving unexpired terms, we find this argument to be quite specious.

**30.** Contrary to the protestations of Justice McGraw regarding the disenfranchisement of this state's voters that results from granting the writ of prohibition, the citizens' right to vote for the candidate of their choice is not impeded through a temporal denial of candidacy. When Justice McGraw is eligible to seek a new term on this Court, the voters may accordingly exercise their franchise rights. To suggest, as does Justice McGraw, implicitly if not overtly, that the right to franchise supersedes this state's legitimate interest in regulating its judicial office-

holders and in maintaining the integrity of the judicial system is simply untenable. *See Storer*, 415 U.S. at 736, 94 S.Ct. 1274 (upholding California election code provisions imposing ballot restrictions affecting independent candidates and expressly holding that "State's interest in the stability of its political system" "outweigh[s] the interest the candidate and his supporters may have" in seeking ballot access); *Signorelli*, 637 F.2d at 858 (explaining that while N.Y. regulation prohibiting Congressional candidacy during judicial term limits "absolutely the choice of the electorate" "for a period of time," such provision "places no obstacle between ... [a candidate] and the ballot or his nomination or his election. He is free to run and the people are free to choose him").

**1.** As I file this dissent, there are eerie parallels between the majority's creation of a rule in the

## I.

*Correcting the Record Regarding Irregularities in the Selection of the Panel that Heard the Instant Case*

The majority opinion, 208 W.Va. at 599 n. 27, 542 S.E.2d at 420 n. 27, sharply criticizes my remarks at the oral argument of this case regarding the selection of members of the panel that heard this case.

The majority opinion characterizes my remarks as making "clear that ... [I] refuse[ ] to believe that the majority has not wrongly based its ruling on perceived political leanings." *Id.* My choice would be not to respond at all to this swipe by the majority, but the reader of this opinion is entitled to the full picture. Rather than dispute the majority's characterization of my remarks, then, I will simply set those remarks forth in full in an Appendix to this opinion.

The reader may judge for him- or herself whether the majority correctly characterized my remarks regarding the procedures used to select the panel members who heard the instant case. I suggest that the majority's characterization is wrong.

## II.

*The Rhetoric of Rudeness*

To quote from the majority opinion: "The author of this opinion has experienced first-hand that the loss of collegiality can only serve to promote disharmony and impede rational discourse." 208 W.Va. at 599, 542 S.E.2d at 420. Then the majority opinion proceeds to use language conducive to anything but collegial discourse. *See, e.g.,* 208 W.Va. at 587 n. 7, 542 S.E.2d at 408 n. 7, that credits the press with "commentary ... [leading to a] state of calumny that has beset this institution [the West Virginia Supreme Court of Appeals] ...."

"Calumny" is defined in the *Oxford English Dictionary* as "slander."

But it is a case of the pot calling the kettle black for the majority opinion to characterize *others'* language as "slanderous."

For example, the majority opinion describes my dissenting language in this Court's original order by which we agreed to hear the merits of this case as "contorted logic," "shallow," and "jurisprudentially indefensible," 208 W.Va. at 590, 542 S.E.2d at 411. And the majority opinion calls Justice McGraw's attorney "insulting and grossly unprofessional," 208 W.Va. at 597, 542 S.E.2d at 418. The majority opinion further describes Justice McGraw as "audacious" and "impugning the character" of this Court, 208 W.Va. at 588, 598, 542 S.E.2d at 409, 419.

I could go on, but these examples suffice. It was a mistake to include such ephemeral, ill-considered gibes in a formal opinion of this Court. Such an unfortunate choice of words certainly does nothing to encourage collegiality on the Court. (Dissents, being more personal than Court opinions, historically have greater latitude, but even in dissents, harsh, *ad hominem,* language does not age well.)

## III.

*The Majority Opinion is Legally Erroneous*

The majority says that it is "impos[ing] a restriction which affects [Justice McGraw's] eligibility for election to this body, not [his] qualifications for holding a seat on this tribunal." 208 W.Va. at 599, 542 S.E.2d at 420.

In other words, the majority says that imposing a restriction that "affects" certain people—by saying they are not "eligible" to be elected to a seat on this Court—is not the same thing as holding that those same people are not "qualified" to hold a seat on this Court.

For any sensible person, this is an utterly non-existent distinction.

---

instant case that deprives the voters of West Virginia of their right to vote for a candidate—and the decision by a 5–to–4 majority of the United States Supreme Court to create a rule that prohibits the hand count of machine-rejected ballots in the Florida Presidential election, a

procedure that is clearly authorized by state law and is as established and as American as apple pie! In the case of Vice President Gore—and in the case of Justice McGraw—judges should not be making up rules that deny citizens their right to vote!

After wading through a field of irrelevant cases that are apparently cited and discussed to provide cover for the majority's lack of authority for its holding, the majority opinion ultimately hangs its jurisprudential hat on our recent case of *Philyaw v. Gatson,* 195 W.Va. 474, 466 S.E.2d 133 (1995).

In *Philyaw,* we upheld a (properly promulgated) Supreme Court rule that said that a magistrate court employee—not a judicial officer—had to resign their employment with the court system, if they ran for a *non-judicial office.*

We said that this rule was not an imposition of an additional qualification on a candidate for office, but was a "reasonable requirement[ ] for retaining employment [in the] ... judicial branch." We specifically grounded the reasonableness of this regulatory restriction on judicial employees upon the analogous express constitutional provision forbidding judicial officers from running for non-judicial office.

Contrasting *Philyaw* with the instant case: the majority is not reviewing an employment restriction—it is creating one, out of whole cloth.

Prior to this case, no West Virginia judicial officer or employee has ever been barred from running for any judicial office—because, of course, their right to do so is specifically reserved in our *Constitution.*

The majority has by its own acknowledgment created a "restriction" that has no grounding in any written provision of any rule, statute, or constitutional phrase.

The restriction that the majority is creating is not—as it was in *Philyaw* for the judicial employee—part of any power that is given to this Court to set the "conditions" for Justice McGraw's "employment" in his current seat on this Court.

Justice McGraw's "employment" conditions are entirely set by the *Constitution* and other applicable express law. Justice McGraw could be removed from office for a breach of those conditions—not by any vote of the majority of this Court—but only by impeachment.

*Philyaw,* then, the sole case that the majority uses to support its distinction-without-a-difference reasoning, is totally inapposite to the case of Justice McGraw.

IV.

*The Majority Opinion Fulfills A Warning from the Past, and Violates Justice McGraw's Fundamental Constitutional Rights and the Rights of the Voters of this State*

The *West Virginia Constitution,* Art. 8, § 7, "General Provisions Relating to Justices, Judges and Magistrates," states in pertinent part, with emphasis added:

> No justice, judge or magistrate shall hold any other office, or accept any appointment or public trust, under this or any other government; *nor shall he become a candidate for* any elective *public office or nomination* thereto, *except a judicial office;* and the violation of any of these provisions shall vacate his judicial office.

This language is easy to understand. It is clear that if Justice McGraw chose to run for Governor, or State Senator, or County Commissioner or for any other non-judicial office, he would have to first resign from the judiciary (or be automatically removed by filing for the office).

However, it is equally clear that if Justice McGraw chose to run for Magistrate, Circuit Judge, or a Supreme Court seat—all "judicial offices"—he is not required to resign from his currently-held judicial office.

How in the world can anyone say that—on reading this clear language—Justice McGraw should believe that he was barred from running for an open seat on this Court, when that open seat *is* a "judicial office?"

But the majority (in essence) says—". . . it just doesn't *seem* right."

Well, a little over 100 years ago, a great Justice [then a Judge] on this Court warned of the dangers of letting people tamper with the *Constitution* when they thought something "didn't *seem* right."

Not long after the *Constitution* of this state was adopted, Justice Brannon warned that permitting additional qualifications for

office to be imposed—by any process other than constitutional amendment—would make the fundamental right to hold public office "subject to the fluctuation of sentiment, the caprices of constantly changing legislatures, the passions of the hour:"

If one additional material qualification may be prescribed, why not another? Why not many others? The constitution is fundamental law, and strictly construed in defense of the citizen's rights. It is the Magna Charta of his freedom and rights, political and civil. Admit once that it does not fix his qualification for office. Where would his disfranchisement end? That would depend upon uncertain political, religious, or other winds. Would we limit the act within the bounds of the reasonable? That would be indefinite, unsafe, precarious, dependent upon the times and motives and aims dominating them. Against these things, it was intended to embed the right in the solid rock of the constitution.

*State ex rel. Thompson v. McAllister*, 38 W.Va. 485, 507–08, 18 S.E. 770, 777–78 (1893) (dissenting opinion of Justice Brannon, adopted by this Court in *Marra v. Zink*, 163 W.Va. 400, 256 S.E.2d 581 (1979)).

In the case before the *Thompson* court, an additional qualification for office had been created by at least a colorably legitimate way—legislative enactment.

In Justice McGraw's case, an additional qualification for office has been created *by a majority of this Court*, which has asserted the right to add a qualification that is found nowhere in our *Constitution*—in accordance with the majority's views of public policy.

In both cases, the result is the same: a fundamental constitutional right of West Virginians has been made "indefinite, unsafe, precarious, dependent upon the times and motives and aims dominating them." *Thompson*, 38 W.Va. at 508, 18 S.E. at 778.

West Virginia law is clear that *every citizen has the right to run for public office. That right can be tempered only by explicitly stated requirements:*

The right of a citizen to hold office is the general rule, and ineligibility to hold office is the exception, hence courts will hesitate to take action resulting in deprivation of the privilege to hold office, except under explicit constitutional or statutory requirements.

*State ex rel. Thomas v. Wysong*, 125 W.Va. 369, 24 S.E.2d 463, 468 (1943) (citation omitted); *Webb v. County Court of Raleigh County*, 113 W.Va. 474, 168 S.E. 760, 761 (1933) ("it is so generally true that one who is a citizen and voter is qualified to hold public office, that any exception to that generality should be made clear and explicit").

The majority *admits* that there is no clear or explicit constitutional or statutory prohibition to Justice McGraw's candidacy for election to a 12–year seat. The law mandates that Justice McGraw is presumed to be eligible for office unless the *Constitution* clearly and explicitly prohibits his candidacy.

It is not Justice McGraw's burden to point to some explicit provision allowing him to run for office, because his eligibility is presumed; rather, the law is clear that *his right to run can be taken from him only by some clear and explicit constitutional restriction—not by a judicially-imposed restriction.* The Court's ruling in this case thus turns long-standing precedent on its head.

This Court's articulation of a new public policy in this case is extraordinary, especially in light of the obvious fact that the Court's previous holdings—recognizing that our State *Constitution* has at its core a fundamental right to run for office—confirm that *the public policy of West Virginia is the fundamental right to run for office itself.*

Creating, from whole cloth, a vague new "public policy" that defeats the clear expression of this fundamental constitutional right, is antithetical to all known forms of constitutional interpretation. It is wrong for the Court to search outside the *Constitution*, to create a new public policy to defeat Justice McGraw's fundamental constitutional right. The heart of constitutional construction is not to search for ways to defeat a fundamental constitutional right, but *to ensure that such rights are preserved.*

Qualifications to run for office other than those explicitly stated in the *Constitution* itself are unconstitutional. Such extra-con-

stitutional qualifications—be they enacted by the Legislature or, as here, enacted by judicial "public policy" lawmaking—are expressly violative of the *West Virginia Constitution* ... since there is no direct authority in our *Constitution* for the Legislature to establish qualifications for office in excess of those imposed by [the West Virginia *Constitution* ...] we find qualifications other than those in [the *Constitution*] unconstitutional by its very terms and under our own equal protection, ... due process, ... and freedom of speech and assembly ... provisions.

(Citations omitted.) *Marra,* 163 W.Va. at 407, 256 S.E.2d at 586.

*Marra* overruled a whole line of cases that appeared to allow the Legislature (but not the judiciary) to impose extra-constitutional qualifications. The majority's holding in the case at bar not only allows the extra-constitutional qualifications barred by *Marra,* it takes the heretofore never-articulated position that the judiciary may create from whole cloth new qualifications for office.

The State may not take action to deny a fundamental constitutional right unless there is a showing that such denial is necessary to achieve a "compelling state interest." Syllabus Point 3, in part, *State ex rel. Sowards v. County Com'n of Lincoln County,* 196 W.Va. 739, 474 S.E.2d 919 (1996):

> The public policies in protecting fundamental rights, preserving electoral integrity, and promoting both political and judicial economy have prompted a practical approach in assessing whether an election case is appropriate for mandamus relief. The fundamental and constitutional right to run for public office cannot be denied unless necessary to achieve a compelling state interest.

But this "compelling state interest" analysis is used only where *the State* has taken some action to deprive a citizen of a fundamental constitutional right:

> It is beyond cavil that *when a state acts* to the disadvantage of some suspect class or to impinge upon a fundamental right explicitly or implicitly protected by the West Virginia Constitution, strict scrutiny will apply, and *the state will have to prove* that its action is necessary because of a compelling government interest.

*Phillip Leon M. v. Greenbrier County Bd. of Educ.,* 199 W.Va. 400, 484 S.E.2d 909, 913 (1996) (emphasis added).

"The West Virginia Constitution confers a fundamental right to run for public office, which the State cannot restrict unless the restriction is necessary to accomplish a legitimate and compelling governmental interest." Syllabus Point 2, *State ex rel. Billings v. City of Point Pleasant,* 194 W.Va. 301, 460 S.E.2d 436, (1995). *Accord, e.g., State ex rel. Piccirillo v. City of Follansbee,* 160 W.Va. 329, 335, 233 S.E.2d 419, 423 (1977); *White v. Manchin,* 173 W.Va. 526, 318 S.E.2d 470 (1984).

In other words, when the State passes a law that infringes on a fundamental constitutional right, such as the right to stand for election, such a law only withstands strict constitutional scrutiny if it is narrowly tailored to meet a compelling state interest.

Never before has this Court used a "compelling state interest" analysis, not to review, but to *create from whole cloth,* a constitutional abridgement.

In the instant case, *the State* has taken no action to deprive anyone of a fundamental constitutional right. To the contrary, Secretary of State Hechler has sought to *protect* Justice McGraw's fundamental constitutional right to stand for election.

There was an attempt in the House of Delegates this year to legislate the very restriction on Justice McGraw's fundamental constitutional right that was sought by the petitioner in this case. Had that measure been enacted, the question of whether the measure was designed to meet a compelling state interest may have presented itself to this Court, because such a law would have abridged Justice McGraw's clear constitutional right to run for office.

But the measure failed. Indeed, the Legislature's failure to pass such legislation is another nail in the coffin of the "public policy" rationale used by the majority. This seems clear from the reaction to this Court's decision by one of the failed House bill's sponsors:

McGraw's point of view has support from an unlikely corner:

one of the legislators who introduced a bill, spurred by McGraw's candidacy, to block elected officials from running for an office in the middle of another term.

"I think the decision is ridiculous," said Delegate John Doyle, D–Jefferson.

"I don't think you ought to be allowed to do it, but I don't think it is proper for the Supreme Court to concoct a law from whole cloth making it illegal."

The ruling "has all the sounds of judge-made law," Doyle said.

The court had to go to New York to find a precedent precisely because there is nothing in West Virginia law to either forbid or permit the practice, he said.

And it should be up to the Legislature or to the voters, via constitutional amendment, to outlaw the practice, not the court, Doyle said.

It's also unclear if Thursday's ruling extends to offices other than that of Supreme Court justice, as the legislation did. The bill, which was sponsored by members of House leadership, passed the House but never came to a vote in the Senate.

March 24, 2000, *Charleston Daily Mail.*

If the "public policy" of the State is so clear as to restrict Justice McGraw's candidacy, the Legislature presumably would have passed the measure. Concomitantly, if Justice McGraw's fundamental constitutional rights are to be abridged, it must come from the Legislature or by constitutional amendment, not from this Court. There is no precedent that allows this Court to craft "public policy" from whole cloth and to abridge a fundamental constitutional right.[2]

Where a provision of the *Constitution* is clear in its terms and of plain interpretation to any ordinary and reasonable mind, it

should be applied and not construed. As stated in Syllabus Point 3 of *State ex rel. Smith v. Gore,* 150 W.Va. 71, 143 S.E.2d 791 (1965):

Where a provision of a constitution is clear in its terms and of plain interpretation to any ordinary and reasonable mind, it should be applied and not construed.

The *Constitution* clearly and plainly allows a "justice" to run for "a judicial office." *West Virginia Constitution,* Art. VIII, § 7. There is no exception to this provision; there is simply nothing that can be interpreted to limit a justice's right to run for "a judicial office."

Another term on the Supreme Court of Appeals is, obviously, "a judicial office." Nothing about the relevant portion of Art. VIII, § 7 is unclear, yet the majority has grafted onto it an exception for justices who already are in office. The majority's action in this case is not an "interpretation" of Art. VIII, § 7, but an *expansion* of it.

The Court could not possibly be interpreting the phrase "a judicial office" because that phrase is clear, and includes the office of Justice of the Supreme Court of Appeals. If it did not, circuit judges like Justice Maynard and myself, who ran for a term on the Supreme Court of Appeals while still sitting as circuit judges, would have been barred from running at that time. Rather than interpreting the provision, the majority is expanding it. Such an expansion is foreign to all precedential rules of constitutional construction.

The Court's decision also completely ignores longstanding precedent from West Virginia and around the nation that requires every reasonable construction in favor of eligibility for office. In *State ex rel. Maloney v. McCartney,* 159 W.Va. 513, 223 S.E.2d 607 (1976), this Court stated that: "[i]n the event

---

**2.** "[A] judge's strong belief that the legislature has made a grave error of public policy is not a valid legal reason for declaring an act unconstitutional. Public policy is a legislative function, not a judicial one, and if courts infringe upon this legislative function by judicial fiat, decision or opinion, it is just as surely a violation of the separation of powers." Franchini, Gene E., Justice, New Mexico Supreme Court, "Conscience, Judging, and Conscientious Judging," 2 *J.App.*

*Prac. & Proc.* 19, 21–22 (2000). In 1982, Justice Franchini resigned his (trial court) judgeship, rather than impose a legislatively-mandated prison sentence on a first-time offender for whom a jury had recommended leniency and whom the judge had concluded should be placed on probation. He later was elected to the New Mexico Supreme Court in 1990 where he now serves as a justice. In 1997–1998 he served as the chief justice of his court.

of ambiguity a constitutional amendment will receive every reasonable construction in favor of eligibility for office."

Thus, even if the majority ignores the overwhelming precedent mandating that the right to run for office can be abridged only by clear and explicit *legislation,* this Court would have to determine that the provision in question was somehow "ambiguous." And if it was ambiguous, then every reasonable construction must be made in favor of eligibility for office.

Obviously, there is no ambiguity to construe, as there was in the case of the "law practice" requirement for judicial candidates in *State ex rel. Haught v. Donnahoe,* 174 W.Va. 27, 321 S.E.2d 677 (1984). Even if the petitioner had been able to point to some ambiguity that could conceivably be used to support his position, this Court would be ignoring the law in regard to the presumption of eligibility, if it omits any reasonable construction of the Constitution that would allow a sitting justice to run for "a judicial office." Art. VIII, § 7, *West Virginia Constitution.*

Significantly, the petitioner has never suggested that a construction of Art. VIII, § 7, that allows a sitting justice to run for re-election before the expiration of his present term, is unreasonable.

Indeed, considering the fact that the right to run for office is a fundamental constitutional right and the fact that any ambiguity must be construed in favor of eligibility, such a construction is, at the very least, a reasonable one. It would be a departure from reason and logic and require extraordinary contortions of accepted definitions to find otherwise. The law mandates that this Court ask the question: If the provision is ambiguous, is there any reasonable construction that would allow a sitting justice to run for a separate term on the court? The *Constitution* specifically allows, *without exception,* a "justice" to run for "a judicial office." Justice McGraw is a "justice," and the two seats open during the 2000 election are both "a judicial office."

## VI.

### *The New York Opinion in Hurowitz does not Provide a Basis for this Court's Decision*

The decision of the New York Court of Appeals in *Hurowitz v. Board of Elections,* 53 N.Y.2d 531, 443 N.Y.S.2d 54, 426 N.E.2d 746, (1981), a 3–page, 4–3 decision, *construing the constitution of New York,* is the only direct authority cited by this Court for its ruling. However, *Hurowitz* does not lend any controlling legitimacy for the majority's reading of the West Virginia *Constitution.*

Most importantly, in New York State, contrary to West Virginia law, the right to hold public office is not considered to be a "fundamental right," and it may be restricted simply upon a showing that the restriction has some "rational basis." *In the Matter of Rosenstock v. Scaringe,* 388 N.Y.S.2d 876, 357 N.E.2d 347, 40 N.Y.2d 563 (1976).

In West Virginia, by contrast, citizens have a fundamental *constitutional* right to hold public office, unless some clear and explicit constitutional provision disqualifies them. *E.g., State ex rel. Thomas v. Wysong,* 125 W.Va. 369, 24 S.E.2d 463, 468 (1943). Thus, even if the constitutions of the two states were identical—and they are not—only West Virginia requires that there be a clear and explicit constitutional provision in order to render a candidate ineligible for the ballot, and the New York case is easily distinguishable on that basis alone.

The New York court did not purport to find that the constitutional clause providing that a judge may not "be eligible to be a candidate for any public office other than judicial office" clearly and explicitly barred sitting judges whose terms have not yet expired from becoming candidates for identical positions on the same court; and under New York law, unlike West Virginia law, no such clear and explicit provision was required to restrict the rights of the petitioner in *Hurowitz.* Indeed, the slim majority in *Hurowitz* based its ruling upon the entirety of New York's extremely complex constitutional provisions regarding eligibility and terms of judicial offices.

The only authority cited by the *Hurowitz* court, *People ex rel. Jackson v. Potter*, 47 N.Y. 375 (1872), does not even mention the relevant constitutional provision; the only issue in that case dealt with the right of succession, where an incumbent judge resigned on the day before a general election. Moreover, the comprehensive constitutional scheme construed by the *Hurowitz* court provides, *inter alia*, that "[w]hen a vacancy shall occur, otherwise than by expiration of term, in the office of judge ... it shall be filled for *a full term* at the next general election." *New York Constitution*, Art. VI, § 21(a). Therefore, in New York, unlike West Virginia, if a judge resigns in order to accept another judicial position, the person elected to replace him is elected for a full term, rather than the unexpired portion of his original term. Obviously, this creates a much more significant potential for disruption of the court's intended structure of staggered terms than does the comparable provision in the West Virginia *Constitution*.

When read as a whole, the New York *Constitution's* eligibility provisions are dissimilar to those of the West Virginia *Constitution*. Simply stated, because West Virginia law and constitution require application of very different legal standards than New York law, the *Hurowitz* ruling does not support this Court's rewriting of the clear and unambiguous provision of the West Virginia *Constitution*, which permits a judge to run for "a judicial office," without any restriction or qualification.

Lastly, the vote in *Hurowitz* was 4–3, and the whole opinion was less than three pages. I think that the minority justices in New York were correct, when they said: "As powerful as are the policy arguments for preclusion of a candidacy of the nature here involved, no such prohibition can be found in the provisions of the Constitution or of any statute. The proscription against candidacy of a Judge for public office 'other than judicial office' cannot reasonably be read as does the majority, nor do the provisions of the Rules of Judicial Conduct furnish any basis for interpretation of the Constitution ... outlawing the instant candidacy by judicial fiat." 53 N.Y.2d at 535, 426 N.E.2d at 749.

## VII.

### *The Business of Judging*

It is ironic that the majority panel—entirely composed of pragmatic politician/judges who have substantial personal experience and understanding of the politics of judging—have chosen to affix their support to the majority opinion's erroneous rhetoric about courts being "pure" and "above the fray" of the world of politics.

This rhetoric is, of course, poppycock.

As one noted scholar put it:

Whether judges are mere oracles of fixed and known legal principles is a question which most social scientists thought resolved more than fifty years ago by the realist revolution. The battle need not be fought again here. In the modern view, well established among political scientists, sociologists, and eminent legal thinkers, judges not only make conscious policy choices in the adjudication of cases and in the exercise of the power of judicial review, but also engage in political decision-making as a matter of function. "The judges are [political] actors charged with special responsibilities, and their decisions ... allocate values in society such as opportunity, liberty, money, protection, or representation in other types of decision-making. Like other political decision-making, this allocation of values is differential; that is, some individuals and groups are favored and others are disadvantaged. These policy outputs are called 'justice.'"

At the appellate court level, judges are likely to confront policy choices directly in the course of developing common law principles and in interpreting state constitutional and statutory provisions. Even in the process of reviewing lower court decisions for procedural irregularities or substantive errors, however, appellate court decisions may serve to favor some kinds of interests while disadvantaging others, demonstrating thereby the political nature of the judicial function.

This view of the judicial process does not posit that judges are merely "politicians in robes" or that judicial policy-making is ex-

actly like that engaged in by legislatures and executives; these over-simplifications do not withstand even casual analysis. Nor does it deny that relatively few cases are explicitly partisan or ideological in nature or that many times judges are called upon to make relatively minor and technical adjustments in long-settled principles of law. But it does emphasize that judicial discretion is extensive and that judges are aware of the options available to them and the differential effects alternative choices will have upon individuals and groups affected by the litigation before them. Finally, of course, this conception of the political nature of judicial decision-making recognizes that judges frequently are able to develop common law, to interpret statutes and administrative regulations, and to adjudicate constitutional disputes—all opportunities which allow judges explicitly to make, veto, legitimize, or reinforce public policies.

Phillip L. DuBois, *From Ballot to Bench*, pp. 23–24, University of Texas 1978.

Or as journalist Tom Miller more vernacularly opined in the April 3, 2000 edition of *The Charleston Gazette:*

There was some talk—but not much—instigated by the governor during the 2000 legislative session about the possibility of electing our Supreme Court justices in a nonpartisan election. Events in recent days prove how transparent that unlikely change would be.

Just as there is nothing more partisan than the nonpartisan county board of education in the state's 55 counties, there would be nothing more partisan in state government than a nonpartisan Supreme Court.

These five people get to make the final decisions on the tough political issues that the two other branches of government can often duck. Next on the table is the constitutional correctness of the $4 billion pension fund bond issue. Maybe the governor and Legislature should ask these folks to solve the Public Employees Insurance Agency funding problem.

Last week, the court decided that gubernatorial candidate Denise Giardina can't have her cake and eat it too. By a 3–2 vote, the court refused to review a lower court ruling that as a member of an independent party, she can't get people who are registered with one of the two major political parties to sign her nominating petitions unless she warns them that this will prohibit them from voting in their own party's primary election in May.

The week before, the court told one of its own, Justice Warren McGraw, he can't run for a 12-year term on the court while he's serving a shorter term. And before that it was the controversial rejection of Gov. Cecil Underwood's appointment of House Speaker Bob Kiss, D–Raleigh, to fill a seat on the court.

These are partisan, political hot potatoes that demand partisan, political decisions. Probably no one among us can agree completely with all three rulings, but who can complain that they dodged the question?

What did the Legislature do about third-party candidates? Last year lawmakers did remove the penalty for signing one of these nominating petitions and then voting in the Democratic or republican primary, but didn't change the section that says it still prohibits this double dipping by voters. Lawmakers also doubled the number of signatures required for third-party nominations for good measure.

And why did a Republican governor appoint a Democrat to the court? For the likely reason that he wanted to curry favor with Democratic voters he needs so desperately in November to win another term, with the hope that it would be rejected so he could then name a Republican to appease his own grumbling GOP ranks.

The partisan labels in the Supreme Court right now may more correctly be business and labor than Democrat and Republican, but partisanship is alive and flourishing. And changing the election labels won't alter those dynamics.

Both academics and journalists agree that a necessary part of the business of judging is deciding difficult political issues. The art of good judging, as I see it (and I think most honest judges would agree), is doing so in a

way that properly respects the structure of our democratic, constitutional system.

It is utterly absurd to suggest that judges just "apply the law," and do not make decisions that are influenced by their philosophies—or their "prejudices"—the unfortunate term that the majority chooses to use.

For example, my former colleague, Justice Margaret Workman, is (and was while she sat on this Court) strongly "prejudiced" toward helpless children. And whenever she could, she made judicial choices that favored those children.

Some people thought that Justice Workman sometimes "stretched the law" to favor children—and they were probably right. But she never, in my opinion, stretched it beyond the permissible bounds imposed by our constitutional, democratic system.

The majority in this case, I suggest, are certainly bringing their "prejudices," or phi-

losophies, to the issues before them. There is nothing wrong with that.

But they are also improperly "stretching the law" well beyond the limits of our *Constitution.*

## VIII.

### *A Final Note* [3]

In conclusion, let me step back for a moment from the specific legal reasons why the majority opinion is wrong.

I personally understand why many people would oppose allowing a sitting justice—any sitting justice—to run for a full term before his unexpired term is finished. If the Legislature prohibited such conduct, I might even vote as a judge to uphold such a law. And if I were writing our Constitution, I might support inserting such a clause.

But our Legislature, the elected representatives of our people, declined the opportuni-

3. It is interesting to note that, despite a professed concern for "collegiality," when the author of the majority opinion completed his first, or second, or however many drafts of this opinion he made, he did not share them with me, the dissenting member of the Court. For some unknown reason, after the Court voted and made a tentative decision, and I was noted as a likely dissenter to that decision, I was thereafter removed from the loop. This not only strikes against the concept of "collegial discourse," but it was an outright violation of our longstanding internal practices and procedures.

For as long as I have been on this Court—and for as long as other Court staff here can remember—drafts of opinions are circulated before publication to *all* members of the Court—dissenters included—for review. This is done out of collegiality, to allow other members to point out possible errors or suggest corrections, and to provide the opportunity for all members of the Court to again try to persuade others to their respective points of view. After a final draft has been circulated to other members of the Court, the full Court meets—dissenters included—to discuss the opinion and ultimately to approve it for filing. We call this final step in the process an "opinion conference."

In this case, not only was I not permitted to see the majority opinion before it was filed, but the opinion was filed on a Friday, after I had left town earlier in the day. *I did not learn that the majority opinion had been filed until I read about it in the newspaper,* about a week later. And, to the best of my knowledge, the Court had no "opinion conference"—or, at least, none to which I was invited.

These circumstances hearken back to the shenanigans that occurred on this Court in 1901, when the majority believed that Judge Marmaduke Dent was not entitled to share the files and official court documents in a case involving West Virginia University, *Hartigan v. Board of Regents of West Virginia University*, 49 W.Va. 14, 38 S.E. 698 (1901). *See* Reid, John Phillip, "An American Judge: Marmaduke Dent of West Virginia," New York University Press, 1968, p.64. Judge Dent wrote in *Hartigan*, in dissent:

For reasons known only to themselves my associates denied me knowledge and inspection of their opinion and syllabus until after it was handed down, or became public property. This is a matter of judicial courtesy or ethics, and, as a learned judge has said that courtesy is a mere matter of taste, about which there is no disputing, and from which there is no appeal since dueling has been abolished, every judge has the right to treat his confreres as he sees proper, according to his inward consciousness and outward experience. Not having been admitted to their exclusive consultations over nor been made aware of their written conclusions until after given to the public, I deem it my duty to review these conclusions, as some of them appear to me to be plainly violative of the true principles of law and justice, and the opinion as a whole to be evasive, inconclusive, and unsatisfactory as an exposition of sound law, although an admirable paper for other purposes.

49 W.Va. at 51, 38 S.E. at 714. Perhaps the majority's conduct was right in Judge Dent's case, but I do not believe it was right in the instant case.

ty to enact such a law—just this year! And I am not writing a new *Constitution,* but applying the one we have.

Under our *Constitution,* there is only one group of people who have the legal power to say—if they want to—that what Justice McGraw intended to do was a bad idea.

That group is not the *ad hoc* group of judges in the majority,[4] who have conjured up a phantom restriction out of their own feelings about what seems "right" to them.

Let me reiterate: *The only group of people who have the legal right to say that what Justice McGraw sought to do would be a bad idea are the voters of West Virginia.*

The majority opinion unconstitutionally *steals* the right to choose from the voters of this State. The majority has, in effect, successfully assisted the Hilton Head/Lincoln Navigator crowd in hijacking an election from the Myrtle Beach/pickup truck folks.[5]

I therefore dissent.

## APPENDIX

Comments of Justice Larry V. Starcher in Court on March 17, 2000, before oral arguments were heard in *State of West Virginia ex rel. George E. Carenbauer v. Honorable Ken Hechler, Secretary of State of the State of West Virginia, and the Honorable Warren R. McGraw, Justice of the Supreme Court of Appeals of West Virginia:*

Before we begin our discussions here today, I feel compelled to make a few com-

ments on the method this Court was filled to hear this matter. In doing so, I would first like to back up and share with you how the panel of judges that decided the *Kiss* case was selected.

First, as a member of this body, I understood the import of the *Kiss* case. I was shocked when I heard the case had been filed. Personally, I had already been assisting Speaker Kiss to move into what were to be his chambers.

In preparation for selecting acting justices to fill the *Kiss* Court, I first carefully read the relevant constitutional, statutory, and Supreme Court rules. I next researched the Court records to determine how the filling of open seats on the Court for a particular case had been done in the past ... and then I took the matter to the full Court—with all five justices participating—to discuss the process to be used in filling the Court.

One of my concerns was that I did not want my legacy on this Court to be that I "packed the Court" to achieve a political end. I told the other members of the Court that I proposed to fill the Court with one retired justice and one sitting judge. I further advised the Court that I would ask all retired justices whether they would serve, if asked— we had three in West Virginia at the time— with Justice Caplan residing in Florida.

I next told the Court that I would try to select a sitting judge of stature who had not originally been a member of the Legislature and who had achieved his/her office by ap-

---

4. None of the members of the majority were ever elected to this Court by the citizens of this State.

5. The Chief Justice of this Court who selected two of the four members of the majority panel in the instant case—before recusing himself from the further consideration of the instant case for what I see as an unauthorized reason, *see* Appendix—traveled to Washington, D.C. in December of 1999, to speak on a panel sponsored by the Federalist Society. In his remarks, he characterized a decision by this Court—*Bower v. Westinghouse Electric Corp.,* 206 W.Va. 133, 522 S.E.2d 424 (1999)—as authorizing our circuit courts to make cash giveaways to undeserving West Virginians, who this justice believes would spend their "windfalls" on "pickup trucks" or "Myrtle Beach vacations." *See http://www.fedsoc.org/medical-monitoring.htm.* Of course, our decision in *Bower* authorized no such thing. And the dissent filed

by this Justice in that opinion did not repeat, for home consumption, the patronizing remarks about pickup trucks and Myrtle Beach vacations that no doubt got a real chuckle from his Hilton Head/Lincoln Navigator audience in Washington.

The Federalist Society is a corporation-funded group that promotes "hands-off" government— when it comes to the government regulating big corporations, that is. The Society's website features a list of "Top Ten Federal Government Efforts To Suppress Free Speech" that attacks the Child Online Protection Act, Gambling Advertising Regulations, Bank Disclosure Regulations, Civil Rights Investigations, FDA Drug Advertising and Labeling Regulations, Election Campaign Expenditure Regulations, and Workplace Harassment Laws. *See http://fed.soc.org/top-ten-freev3il.htm.*

pointment (part of the issue in the *Kiss* case), and who was a judge that was not a particularly close friend of mine. Quite frankly, I had in mind Retired Justice Thomas McHugh and sitting Judge (former Justice) Arthur Recht.

Mind you, time was of the essence in the *Kiss* case as it is in this matter. So, my first round of telephone calls was made to the retired justices living in West Virginia. I initiated each of my conversations with an admonishment to "Please do not tell me if you have any preliminary thoughts about the case—I only want to know if you are available to serve, should I ask you." Two said they were available; one said that he felt that he was disqualified based on his current law practice.

I quickly asked Retired Justice Miller to sit and he accepted. This, in my mind, then eliminated Judge Recht as the sitting judge because both he and Justice Miller are from Wheeling, and, at one time, they worked together in the same law firm—I believe. So, I thought back to the discussion we had when I originally took the matter to the Court. One consideration I heard was: "Why not someone from south of Route 60?" That comment was strongly stated by two members of the Court when I had taken the matter to conference.

I got out the list of our circuit judges—called one who resides in the heart of our coal fields ... he declined. Called another from a southern county who said he had a conflict because his daughter was an attorney who worked in the same law firm as did Speaker Kiss, and I received a third rejection from another southern judge. I did another review of the list of judges, still knowing that I needed to act quickly.

I then set the matter aside and began reviewing our next week's docket. There were two cases on the docket from which I was disqualified because they were from my home circuit and I had been involved in them as a circuit judge prior to coming on the Court. Acting Chief Justice Maynard had appointed Judge Clarence Watt to sit on those cases in my place.

So, I said to myself ... Judge Watt is our most senior judge in age, he does live south of Route 60 (Hurricane), and he has been a judge for over 20 years. And, I found out that had served 12 years as a prosecuting Attorney. I had never previously appointed Judge Watt to sit on the Court. I inquired of his availability, and the rest is history.

Now let me say a few words about how the panel was selected in this [Carenbauer] case. I was never, even for a split second, consulted or advised of the process by which the acting justices were selected, or who might serve on the Court. I simply had "orders laid on my desk," after the fact.

I do hold each of the circuit judges appointed to sit on this panel [Judges Fox, Jolliffe, and Keadle] in high esteem, and in no way do I question their ability or personal qualifications to sit. But it should be noted that two of the circuit judges sitting here today were appointed by a chief justice, who is either ineligible, or simply refuses, to sit on the very matter to which he made the appointments. The third was appointed by Acting Chief Justice Scott, after Chief Justice Maynard recused himself. The first I knew who would be filling the original two empty seats was when my office was presented a copy of the appointment order. Information about the third appointment took a "twisted trail."

On Tuesday, March 14, I received on my desk a lengthy memorandum from Chief Justice Maynard saying that he was not recusing himself in the matter based on Justice McGraw's second recusal motion. Even though the memo was dated March 7, the filing date in the Clerk's Office was March 13, the day before I received it. At that point I assumed Chief Justice Maynard was sitting on the case. About 2:00 in the afternoon of the same day, there was a rumor running through the halls that the Chief Justice was not going to be sitting on the case, and almost simultaneously I was provided a copy of an order whereby Acting Chief Justice Scott appointed Judge Keadle in his stead. I called Justice Scott on the phone and asked him what was the basis for that action since the latest memorandum I had received advised me that the Chief Jus-

tice was remaining on the case, and notice that his intention to remain on the Court had been filed in the Clerk's office only the day before.

Justice Scott advised me that the Chief had changed his mind and was recusing himself, and that I should have received a copy of his memorandum stating his reasons. In fact, my office had never received a copy of such memorandum. I requested it from the Clerk's office, it was provided, and in less than half an hour later another copy was provided from the Chief Justice's office.

My concern for this panel is that we have two acting justices who are now sitting on this Court who were appointed by an either ineligible Chief Justice, or one who refuses to sit in the matter. I do not believe a judge or justice can simply refuse to sit on a case. We are either eligible and have a constitutional obligation to perform our duty, or we are ineligible, and therefore should take no action in the case whatsoever.

Quite frankly, I would personally like very much not to be sitting on this case. I see myself as a loser either way. I have a good friend who is a candidate for the same office for which two of my colleagues are now candidates. If I rule against my colleagues, it's uncomfortable. If I rule against my friend it will be equally uncomfortable, but I will have to do one or the other.

This case is, to a great extent, a political case—whether we want to say so or not. And, the process used to fill this Court being less than "squeaky clean" may very well magnify public skepticism about its fairness.

Therefore, in closing, I simply want to say the same thing that I said in the *Kiss* matter when it was presented to the Court. If you agree with the decision of this Court, you will likely herald the decision as brilliant, scholarly work; but if you disagree, you will view it as simply more political shenanigans.